**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Charles Pierce Farris and | ) | |
| Pamela Jo Farris, | ) | Case No.: 05-13253-BGC-7 |
| | ) | |
| Debtors. | ) | |

- - -

| | | |
|---|---|---|
| General Steel, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | AP No.: 06-00059 |
| | ) | |
| Charles Pierce Farris, Jr., | ) | |
| | ) | |
| Defendant. | ) | |

- - -

| | | |
|---|---|---|
| Anderson & Associates, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | AP No.: 06-00100 |
| | ) | |
| Charles Pierce Farris, Jr., | ) | |
| | ) | |
| Defendant. | ) | |

- - -

Edward Damore; Kimberly Damore;           )
and Two By Two LLC,                       )
                                          )
                Plaintiffs,               )
                                          )
vs.                                       )    AP No.: 06-00101
                                          )
Charles Pierce Farris, Jr.,               )
                                          )
                Defendant.                )

- - -

Oxygen Service Company, Inc.              )
(now Airgas-South, Inc.),                 )
                                          )
                Plaintiff,                )
                                          )
vs.                                       )    AP No.: 06-00102
                                          )
Charles Pierce Farris, Jr.,               )
                                          )
                Defendant.                )

- - -

Airgas-South, Inc.,                       )
                                          )
                Plaintiff,                )
                                          )
vs.                                       )    AP No.: 06-00104
                                          )
Charles Pierce Farris, Jr.,               )
                                          )
                Defendant.                )

**Memorandum Opinion
on Objections to Discharge and
Complaints to Determine Dischargeability of Debts**

The matters before the Court are the:

1.    Complaint to Determine Dischargeability of Debt filed by General
      Steel, Inc. on January 20, 2006, Adversary Proceeding No.
      06-00059;

2

2.   Complaint to Determine Dischargeability of Debt filed by Anderson & Associates, Inc. on May 22, 2006, Adversary Proceeding No. 06-00100;

3.   Complaint to Determine Dischargeability of a Debt filed by Edward Damore, et al., on May 22, 2006, Adversary Proceeding No. 06-00101;

4.   Complaint to Determine Dischargeability of Debt and Objection to Discharge of the Debtor filed by Oxygen Service Company, Inc. (now Airgas-South, Inc.) on May 22, 2006, Adversary Proceeding No. 06-00102; and

5.   Complaint to Determine Dischargeability of Debt and Objection to Discharge of the Debtor filed by Airgas-South, Inc. on May 22, 2006, in Adversary Proceeding No. 06-00104;

A consolidated trial on all matters was held on January 22, 2008.  Appearing were: the debtor, Charles Pierce Farris, Jr.; his attorney, Robert Charles Gish, Jr.; Hubert C. Lovein, Jr., counsel for General Steel, Inc. and Airgas-South, Inc.; Lucian Gillis, Jr., attorney for Anderson & Associates, Inc.; Michael E. Lee, attorney for Two By Two LLC, Edward Damore, and Kimberly A. Damore; Edward Damore, one of the plaintiffs and a witness appearing by video teleconference; Christopher S. Edwards, a witness; John David Roberts, a witness; and Charlie Lanphier, a witness.[1]

## I.  Summary of Conclusions

Mr. Farris' discharge is due to be denied under section 727 of the Bankruptcy Code.  The allegations relating to nondischargeability of specific debts under section 523 are moot.

## II.  Background

All five adversary proceedings rise primarily from Mr. Farris' operation and management of four companies.  Those are: Houston Steel, Inc.; Houston Steel Fabricators, LLC; Houston Steel Erectors, LLC; and Damore-Abraham Holding Company, LLC.

Each plaintiff contends Mr. Farris owes it a debt.  Each contends that its debt is not dischargeable in this Chapter 7 bankruptcy case pursuant to section 523 of the Bankruptcy Code.  In addition, Airgas-South, Inc., (and its predecessor Oxygen Service

---

[1] None of these matters involve the joint debtor, Ms. Pamela Jo Farris.  Ms. Farris' discharge should be entered shortly.

3

Company, Inc.) contend that Mr. Farris' bankruptcy discharge should be denied pursuant to section 727 of the Bankruptcy Code. Each specific cause of action is discussed below, along with an explanation of the plaintiffs' burdens of proof.

## A. Dischargeability of Debts - Section 523

### 1. General Steel, Inc., A.P. No. 06-00059

The plaintiff General Steel, Inc. is a trade creditor of Houston Steel, Inc. Its debt rose out of its supply of substantial quantities of structural steel and plate to Houston Steel, Inc. on account . General Steel claims that Mr. Farris is personally liable for the debt it claims it is owed. It argues that its debt is nondischargeable because Mr. Farris induced many of the steel deliveries with payments by insufficient checks and once fraudulently altered a performance bond post-delivery. General Steel contends that those acts resulted in its inability to make a claim against a bond. Specifically, General Steel contends that its debt is nondishargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code.[2]

### 2. Anderson & Associates, Inc., A.P. No. 06-00100

The plaintiff Anderson & Associates, Inc. is a judgment creditor of Houston Steel, Inc. Its debt rose out of its supplying materials to Houston Steel, Inc. on account for use on a construction project. Anderson claims that Mr. Farris is personally liable for that debt. It argues that the debt is nondischargeable because Mr. Farris deceived its representative into executing a lien waiver by promising to deliver a check in full payment of its account. While waiting for the promised check, Anderson allowed the time for making a claim against the general contractor's construction bond to expire, thus resulting in nonpayment of its claim. Anderson contends that Mr. Farris did not intend to keep his promise to deliver the check. Specifically, Anderson & Associates, Inc. contends its debt is nondishargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

---

[2] Section 523(a)(2)(A) reads:

A discharge under section 727... does not discharge an individual debtor from any debt – for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

4

### 3. Edward Damore, et. al, A.P. No. 06-00101

The plaintiffs Edward Damore, Kimberly A. Damore, Edward Damore as Trustee of the Damore 2002 Family Trust, Kimberly A. Damore as Trustee of the Damore 2002 Family Trust, and Two by Two, LLC, claim to be creditors of Mr. Farris personally. They claim their debts rose from monetary contributions to, or investment in, Damore-Abraham Holding Company, LLC . They contend that their debts are nondischargeable because Mr. Farris falsely represented to Mr. Damore that repayment of their contributions would be secured by a security interest in certain valuable equipment. Specifically, Edward Damore, et. al contend that their debts are nondishargeable pursuant to sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code.[3]

### 4. Oxygen Service Company, Inc.
### (now Airgas-South, Inc.), A.P. No. 06-00102
### and
### 5. Airgas-South, Inc., A.P. No. 06-00104

The plaintiffs Airgas and Oxygen Service Company, Inc., (now Airgas) are trade creditors of Houston Steel Fabricators, LLC. They are owed two debts. One rose when Oxygen or Airgas rented 6 gas cylinders to Houston Steel Fabricators which they contend were not returned. Another rose when either rented ten welders to Houston Steel Fabricators which they also contend were not returned. They claim that Mr. Farris is personally liable for both debs. They argue that both debts are not dischargeable because Mr. Farris personally participated in, and orchestrated, the concealment and illicit disposal of the equipment and which purposely impeded Airgas' efforts to recover it. Specifically, they contend their debts are nondischargeable pursuant to sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.[4]

### B. Objections to Discharge

In addition to its nondischargeability allegations, Airgas and Oxygen contend that Mr. Farris' general discharge should be denied under several subsections of section

---

[3] Section 523(a)(6) reads, "A discharge under section 727... does not discharge an individual debtor from any debt – for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

[4] Sections 523(a)(2)(A) and 523(a)(6) are quoted above. Section 523(a)(4) reads, "A discharge under section 727... does not discharge an individual debtor from any debt – for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

727 of the Bankruptcy Code.[5]  Specifically, they contend the discharge should be denied under sections 727(a)(2), 727(a)(3), 727(a)(4), 727(a)(5), and 727(a)(7).  Each allegation and subsection is discussed below.

## 1.  Section 727(a)(2)

Airgas alleges under section 727(a)(2):

> Farris, with intent to hinder, delay and defraud the Plaintiff, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed (1) property of the Debtor, within one year before the date of the filing of the petition, and (2) property of the estate, after the date of the filing of the petition.

Complaint, A.P. No. 06-00102, ¶ 43, Proceeding No. 1.[6]

## 2.  Section 727(a)(3)

Airgas alleges under section 727(a)(3):

> Farris has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which Farris' financial condition or business transactions might be ascertained.

Complaint, A.P. No. 06-00102, ¶ 47, Proceeding No. 1.[7]

---

[5] The complaint filed in adversary proceedings 06-00102 and 06-00104 are the same. The Court will refer to number 06-00102, and the plaintiff as Airgas.

[6] Section 727(a)(2) reads:

The court shall grant the debtor a discharge, unless – the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed.

11 U.S.C. § 727(a)(2).

[7] Section 727(a)(3) reads:

The court shall grant the debtor a discharge, unless – the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

6

### 3. Section 727(a)(4)

Airgas alleges under section 727(a)(4):

Farris has knowingly and fraudulently, in or in connection with the case (1) made a false oath or account, (2) presented or used a false claim, (3) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act, and (4) has withheld from an officer of the estate entitled to possession under this title, recorded information, including books, documents, records, and papers, relating to Farris' property or financial affairs.

Complaint, A.P. No. 06-00102, ¶ 51, Proceeding No. 1.[8]

### 4. Section 727(a)(5)

Airgas alleges under section 727(a)(5):

Farris has failed to explain satisfactorily, before determination of denial of discharge under this 11 U.S.C. § 727, any loss of assets or deficiency of assets to meet the debtor's liabilities.

_____

information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

[8] Section 727(a)(4) reads:

The court shall grant the debtor a discharge, unless – the debtor knowingly and fraudulently, in or in connection with the case –

(A)     made a false oath or account;
(B)     presented or used a false claim;
(C)     gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D)     withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727(a)(4).

7

<u>Complaint</u>, A.P. No. 06-00102, ¶ 54, Proceeding No. 1.[9]

### 5. Section 727(a)(7)

Airgas alleges under section 727(a)(7):

Farris has committed any act specified in Paragraph (2),(3), (4), (5), or (6) of 11 U.S.C. § 727 subsection (a), on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under the Bankruptcy Act, concerning an insider.

<u>Complaint</u>, A.P. No. 06-00102, ¶ 57, Proceeding No. 1.[10]

### C. The Plaintiffs' Burdens of Proof

### 1. Dischargeability of a Debt

The per curiam opinion in <u>In re Wood</u>, Case No. 07-10828, 2007 WL 2376788, 245 Fed.Appx. 916, 917 (11th Cir. August 21, 2007) explains a creditor's burden of proof in a complaint to determine the dischargeability of a debt. It reads, "The objecting creditor bears the burden of proving the § 523(a) dischargeability exceptions by a preponderance of the evidence. <u>Grogan</u>, 498 U.S. at 291, 111 S.Ct. at 661." <u>Id</u>.[11]

---

[9] Section 727(a)(5) reads:

The court shall grant the debtor a discharge, unless – the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5).

[10] Section 727(a)(7) reads:

The court shall grant the debtor a discharge, unless – the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider.

11 U.S.C. § 727(a)(7).

[11] This unpublished decision is cited in accordance with Rules 36-2 and 36-3 of the Court of Appeals for the Eleventh Circuit.

## 2. Objection to Discharge

The opinion in In re Dereve, 381 B.R. 309 (Bankr. N.D. Fla. 2007) explains a creditor's burden of proof in an objection to discharge.  It reads:

> A creditor seeking to deny a debtor's discharge bears the burden of proof as to each element by a preponderance of the evidence. Fed. R. Bankr. P. 4005; Grogan, 498 U.S. at 287, 111 S.Ct. 654. However, once a creditor meets this initial burden, the burden shifts to the debtor to show by a preponderance of the evidence that he or she is entitled to a discharge. Crews v. Stevens (In re Stevens), 250 B.R. 750, 755 (Bankr. M.D. Fla.2000).

Id. at 324.

## III.  Issues

Before the Court addresses any of the specific issues raised in the plaintiffs' complaints, it must address the issue of Mr. Farris' credibility, an issue raised by the plaintiffs' introduction into evidence of records of Mr. Farris' prior criminal convictions.

## IV.  Findings of Fact and
## Conclusions of Law Regarding Mr. Farris' Credibility

The plaintiffs put Mr. Farris' credibility at issue with the introduction of records of Mr. Farris' prior criminal convictions.  As explained below, based on its consideration of those convictions, the Court finds that Mr. Farris' credibility is seriously at issue.[12]  The convictions, the legal standards applied, and the Court's conclusions are discussed below.

### A.  Mr. Farris' Prior Criminal Convictions

### 1.  U. S. District Court, Northern District of Alabama,
### April 7, 2007 - Felony Conviction

Mr. Farris was convicted in the United States District Court of the Northern District of Alabama on April 7, 2007, of one violation of 18 U.S.C. § 1014 and two violations of 42 U.S.C. § 408(a)(7)(B).  General Steel Ex. 296.  The former makes it a felony to knowingly make a false statement in connection with a loan application made to a federally insured bank.  The latter makes it a felony to, with intent to deceive, falsely represent a number to be his or her social security account number when in fact that number is not his or her social security account number.  He is currently serving three concurrent, 57-month sentences, one for each of those convictions.

---

[12] In contrast, the Court finds that no other witness' credibility is at issue.

9

The proof of those two convictions was admitted <u>without objection</u>.  Both crimes involved untruthfulness, deceit, dishonestly and falsification, and therefore bear directly on the propensity of Mr. Farris to testify truthfully or not.

## 2.  U. S. District Court, District of South Carolina, September 18, 1997 - Felony Conviction

Mr. Farris was convicted in the United States District Court for the District of South Carolina on September 18, 1997, of violating 18 U.S.C. § 1344.  General Steel Ex. 292.  That statute makes it a felony to knowingly execute, or attempt to execute, a scheme or artifice to defraud a financial institution, or to obtain any property owned by a financial institution, by means of false or fraudulent pretenses, representations, or promises.  He was sentenced to 24 months imprisonment and ordered to pay $135,753.62 in restitution for his commission of that criminal offence.

The proof of that conviction was admitted <u>without objection</u>.  The crime for which he was convicted involved untruthfulness, deceit, dishonestly and falsification, and therefore bears directly on the propensity of Mr. Farris to testify truthfully or not.[13]

---

[13] This conviction occurred more than ten years before the trial of this matter, although it does not appear to be ten years from the release of the witness from confinement, a fact the Court cannot verify.  Rule 609 includes:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Federal Rule of Evidence 609(b).

If this rule applies, the Court has, for the following reasons, considered the conviction, notwithstanding that it is over ten years old.  First, evidence of this conviction was admitted <u>without objection</u>.  Second, because the nature of the conviction relates specifically to the nature of the allegations before this Court, the Court finds that, "in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Third, The Court finds that the plaintiff gave the defendant, "sufficient advance written notice of intent to use such evidence."

10

### 3. General Session Court of Greenville County, South Carolina, November 12, 1998 - Felony Conviction

Mr. Farris was convicted in the General Session Court of Greenville County, South Carolina on November 12, 1998, of two violations of Code of South Carolina 1976 § 16-13-240(1). General Steel Ex. 295. That statute makes it a felony to, by false pretense or representation, obtain the signature of a person to a written instrument or obtain from another person any property of a value of $5,000 or more with intent to cheat and defraud a person of that property. He was sentenced to 4 years imprisonment for his commission of one of those criminal offenses and 10 years for his commission of the other.

The proof of those convictions was admitted <u>without objection</u>. Those convictions were of crimes involving untruthfulness, deceit, dishonestly and falsification, and therefore bear directly on the propensity of Mr. Farris to testify truthfully or not.

### 4. General Session Court of Greenville County, South Carolina, November 12, 1998 - Misdemeanor Conviction

Also on November 12, 1998, Mr. Farris was convicted in the General Session Court of Greenville County, South Carolina on six counts of violating Code of South Carolina 1976 § 29-7-20. General Steel Ex. 295. That statute makes it a misdemeanor for a contractor to not pay his subcontractors from the funds paid to him under a contract. Mr. Farris was sentenced to 6 months imprisonment for each one of the counts for which he was convicted.

The proof of those convictions was admitted <u>without objection</u>. Given no requirement on the face of the statute for any sort of fraudulent intent, and given proof of Mr. Farris' other felony convictions which did require proof of fraudulent intent, the Court will not attempt to determine whether or not the convictions under § 29-7-20 bear in any way on Mr. Farris' propensity to testify truthfully and they have not been considered for that purpose.

### B. Standards Applied

Assessing a witness' credibility is a question of fact; however, it is based on certain legal parameters. In making its determinations in this case, the Court has applied the standards discussed below.

Writing for the Court of Appeals for the Eleventh Circuit in <u>U.S. v. Peters</u>, 403 F.3d 1263 (11th Cir. 2005), Circuit Judge Stanley Marcus explains:

Assessing witness credibility is uniquely the function of the trier of fact, and it is one that a court of appeals may not and should not endeavor to

11

replicate based on the cold paper record before it. As we have observed previously, "the jury, hearing [the defendant's] words and seeing his demeanor, was entitled to disbelieve [his] testimony and, in fact, to believe the opposite of what [he] said." United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir.1999) (quoting United States v. Brown, 53 F.3d 312, 314 (11th Cir.1995)) (emphasis removed). It is "the jury's prerogative to disbelieve" a defendant's testimony, United States v. Sharif, 893 F.2d 1212, 1214 (11th Cir.1990)....

Id. at 1270.

This Court was the trier of fact at the trial on the pending matters and as such has the same latitude as a jury.  See the unpublished opinion in Es-Tee Realty Co., LLC v. Soumekhian, Case No. 06-5221-CV, 2008 WL 2476712 (2nd Cir. June 19, 2008).[14]

## C.  Conclusions to Mr. Farris' Credibility

Mr. Farris did not object to the introduction of evidence confirming his convictions for specific crimes involving his truthfulness.[15]  While he attempted to explain some of

---

[14] The Summary Order in Es-Tee Realty, includes:

The district court based this determination, in part, on its conclusion that "Weinstock's concession of ... fraudulent conduct, together with his dubious demeanor on the stand, leads this court to conclude that Weinstock's testimony, where it conflicts with that of the Defendants, is less than credible." We give substantial deference to a district court's credibility determinations in this context. "Assessments of the credibility of witnesses are peculiarly within the province of the trier of fact and are entitled to considerable deference. When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. And where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. The fact that there may have been evidence to support an inference contrary to that drawn by the trier of fact does not mean that the findings were clearly erroneous. The weight of the evidence is an argument to be made to the factfinder at trial, not a ground for reversal on appeal." Joseph v. New York City Bd. of Educ., 171 F.3d 87, 93 (2d Cir.1999) (internal quotation marks and citations omitted).

Id. at *1.

[15] Even if he had objected, the wording in Rule 609 of the Federal Rules of Evidence confirms the seriousness of convictions involving a witness' truthfulness.  Writing for the Court

12

those situations, this Court is not convinced and has considered each conviction as impeaching Mr. Farris' credibility.

In light of the multiple felony convictions listed above, all of which involved untruthfulness, deceit, dishonestly and falsification, the Court must conclude that Mr. Farris' propensity in the present case would be to <u>not</u> tell the truth. Consequently, the Court has lent no credence to the testimony given by him, especially to the extent that his testimony is <u>at odds with</u>, or <u>purports to controvert</u>, any of the evidence submitted by the plaintiffs, or is <u>offered to explain or justify any of the acts of malfeasance which he is charged with in this case</u>.

## V. Additional Findings of Fact

Because the Court concludes that Mr. Farris' discharge is due to be denied based on several of the section 727 grounds alleged by Airgas, the Court need not address the individual facts or issues relating to the dischargeability of specific debts.[16] In contrast, the facts that support the denial of Mr. Farris' discharge under section 727 are discussed in detail.[17]

## A.  Mr. Farris Owned and Operated Numerous Business Enterprises before Filing Bankruptcy but did Not Disclose Those on His Petition

Mr. Farris filed his Chapter 7 petition pro se on October 25, 2005.  Question No. 18 of the <u>Statement of Financial Affairs</u> he filed with his petition reads:

18. Nature, location and name of business

_____

of Appeals for the Second Circuit, District Court Judge Albert W. Coffrin, sitting by designation, explains,"evidence of prior crimes involving dishonesty or false statement is highly relevant to the trier of fact in the assessment of a witness' credibility...." <u>U.S. v. Hawley</u>, 554 F.2d 50, 52 (2nd Cir. 1977).   In fact, Rule 609(a) of the Federal Rules of Evidence states that, "evidence that any witness has been convicted of a crime <u>shall be admitted</u> regardless of the punishment, if it readily can be determined that establishing the <u>elements of the crime required proof or admission of an act of dishonesty or false statement</u> by the witness." <u>Id</u>. (emphasis added).

[16] The court in <u>First Omni Bank v. Thrall (In re Thrall)</u>, 196 B.R. 959 (Bankr. D. Colo. 1996) explains, "a determination of dischargeability of a debt is meaningful only in the context of a discharge.  If a case is dismissed prior to entry of discharge <u>or the discharge is denied</u> or revoked, a judgment as to <u>dischargeability of a debt becomes moot</u> unless a subsequent bankruptcy is filed. <u>Id</u>. at 968 (emphasis added).

[17] Mr. Farris made several arguments in favor of his discharge.  While the Court has not summarized those arguments here, it considered them, to the extent that they are credible.

13

a.  If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.  If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the six years immediately preceding the commencement of this case.  If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

Statement of Financial Affairs, filed on October 25, 2005, Case No. 05-13253, Proceeding No. 1.[18]

In response to that question, Mr. Farris checked the box marked "None," that is, he had not been involved in any qualifying business during the six years before he filed his bankruptcy petition.  The evidence demonstrates otherwise.  He was involved in at least eight within that time.  Each is identified below.

---

[18] Section 521 of the Bankruptcy Code, 11 U.S.C. § 521, along with Bankruptcy Rule 1007, Fed.R.Bankr.P. 1007, require every debtor to file certain information in a bankruptcy case.  See In re Waldron, 536 F.3d 1239, 1245 (11th Cir. 2008).  Rule 9009 of the Federal Rules of Bankruptcy Procedure describes the form that information shall take.  That rule reads:

The Official Forms prescribed by the Judicial Conference of the United States shall be observed and used with alterations as may be appropriate. Forms may be combined and their contents rearranged to permit economies in their use. The Director of the Administrative Office of the United States Courts may issue additional forms for use under the Code. The forms shall be construed to be consistent with these rules and the Code.

Fed.R.Bankr.P. 9009.  Consequently, the specific information that those forms require and the manner in which that information is required to be presented have the weight of law.  Mr. Farris chose to use the "Official Forms" recognized by Rule 9009 when he filed the pending case.

14

### 1. Millennium Metal Works, Inc.

At the trial, Mr. Farris testified that, prior to bankruptcy, he was a "partner" in Millennium Metal Works, Inc. Mr. Farris did not state when he was a "partner" in that company, or when that company was in business, or what his role was in the operation of that company. And when asked about Millennium, he testified that he sold his interest back to his partner. When asked whether Millenium had filed bankruptcy, he answered that he did not know what his "partner" had done with it. Mr. Farris testified:

> Q.    Before Blount, immediately before Blount, did you
>       have a company called **Millennium Metal Works**?
>
> A.    I was a partner in Millennium Metal Works.
>
> Q.    Okay. And what happened to that company?
>
> A.    I sold it back to the original partner.
>
> Q.    Okay. Did it thereafter go bankrupt?
>
> A.    I beg your pardon?
>
> Q.    **Did it thereafter go bankrupt?**
>
> A.    **I don't know what Richard did with it.**

Transcript at 293.

Millenium Metal Works, Inc. filed a Chapter 7 bankruptcy in this Court on December 4, 2002, Case No. 02-09584-TOM-7.[19]

Mrs. Dayle Brown, a former employee of a number of Mr. Farris' entities, testified that she started working under him at Millennium Metal Works, Inc. in April 2002. Anderson Ex. 29, Deposition of Mrs. Dayle Brown, at 13 and 26. Her testimony indicates that Mr. Farris was personally running the business operations of Millennium at that time.

---

[19] If this Court were to take judicial notice of the information on Millenium Metal Works, Inc.'s Chapter 7 petition, additional impeachment of Mr. Farris' credibility would exist. As chairman of the board of directors of Millenium Metal Works, Inc., Mr. Farris signed the resolution of that board authorizing the corporation to file that case. Mr. Farris also signed the voluntary Chapter 7 petition for Millenium Metal Works, Inc. Both acts are in direct conflict with his testimony that he sold his interest and did not know what happened to Millenium. But see this Court's discussion of judicial notice at the end of this opinion.

This evidence establishes that within the six years immediately preceding the commencement of the present case, Mr. Farris was an officer, director, or managing executive of Millennium Metal Works, Inc., a business corporation. Further, the evidence establishes that Millennium Metal Works, Inc. operated as a business during those six years. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in that company's business in response to Question 18 of his <u>Statement of Financial Affairs</u>.

## 2. Blount Riggers and Erectors

During that same six years, Mr. Farris owned and operated Blount Riggers and Erectors, Inc. He testified:

> A.    In 2002, I believe, we were contracted by a firm out of Dallas, Texas, to build a project in Macon, Georgia, for Mercer University.
>
> Q.    And we is?
>
> A.    Blount Riggers and Erectors, a steel erection company that I owned at that time.

Transcript at 218.

According to the records of the Georgia Secretary of State, Blount Riggers and Erectors was authorized to do business in the state of Georgia as a "foreign profit corporation" on July 12, 2002. General Steel Ex. 289.

According to his testimony, Mr. Farris purchased $40,000 worth of tools and equipment from the trustee in Millennium's bankruptcy case and sold them to Blount Riggers and Erectors. That testimony included:

> A.    Mr. Toffel, Andre Toffel. I wrote a check for thirty-seven – almost forty thousand dollars to Mr. Toffel to buy tools and equipment from Millennium Metal Works bankruptcy through the Stafford bankruptcy. So I bought forty thousand dollars worth of tools from this courthouse.
>
> Q.    Okay. And you bought them as Chuck Farris or did you buy them as Blount Riggers and Erectors?
>
> A.    Chuck Farris.
>
> Q.    Okay. And then those assets remained Chuck Farris assets while they were used by Blount?

16

> A. I sold them to Blount. At sometime in the future, they became Blount Tools – Blount Riggers & Erectors Tools and Supplies, which then merged into Houston Steel –

Transcript at 333-34.

Mr. Farris also testified that Blount Riggers and Erectors was actively engaged in the business of erecting steel structures during 2002. During that time the company was building a student arena for Mercer University in Macon, Georgia. Mr. Farris testified:

> A. In 2002, I believe, we were contracted by a firm out of Dallas, Texas, to build a project in Macon, Georgia, for Mercer University.
>
> Q. And we is?
>
> A. Blount Riggers and Erectors, a steel erection company that I owned at that time. We were contracted to build a student arena for Mercer University. In the prosecution of that work, we ran up upon Houston Steel Fabricators. They were called Houston Steel, Inc. at the time.

Transcript at 218.

This evidence establishes that within the six years preceding the commencement of the present case, Mr. Farris was an officer, director, or managing executive of Blount Riggers and Erectors, Inc., a business corporation. During that time he owned five percent or more of the voting or equity securities of that corporation and the corporation was engaged in the operation of a business enterprise during those six years. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in that company's business in response to Question 18 of his Statement of Financial Affairs.

### 3. Houston Steel, Inc.

Mr. Farris testified that during Blount Riggers and Erectors' work on the Mercer University project in 2002, he was introduced to Houston Steel, Inc., a company which had the contract to provide the steel for that project. According to Mr. Farris, Houston Steel, Inc. was, at the time, on the verge of filing bankruptcy. Following negotiations with the principals of Houston Steel, Inc., he hired legal counsel who assisted in completing a merger between Blount Riggers and Erectors and Houston Steel, Inc. Through that merger in January 2003, he became the majority stockholder of Houston Steel, Inc. He testified:

17

Q.    Mr. Farris, tell me how you became the owner of Houston Steel?

A.    In 2002, I believe, we were contracted by a firm out of Dallas, Texas, to build a project in Macon, Georgia, for Mercer University.

Q.    And we is?

A.    Blount Riggers and Erectors, a steel erection company that I owned at that time. We were contracted to build a student arena for Mercer University. In the prosecution of that work, we ran up upon Houston Steel Fabricators. They were called Houston Steel, Inc. at the time. They did not perform steel erection work. They had the contract to supply the steel to the same company out of Dallas that we had a separate contract with to erect the steel.

During the prosecution of the work, Houston Steel fell terribly behind schedule and the contractor from Dallas was paying a very high fee to my company for the delays and the problems associated with their fabrication. I was asked by the executive vice-president, John Forrester, who was a friend of mine, that we worked together at Blount years before, to go to Byron and see if I could find out what was wrong.

I did. I went and met with the people several times. And through those meetings I became aware that they were filing for bankruptcy. They had an attorney in Macon. I believe his last name was Jackson. He had prepared a bankruptcy petition for them and they were in the middle of trying to determine an argument between the three owners of Houston Steel as to how that bankruptcy was going to affect them personally because I think the wife of one of the partners was the Probate Judge of Peach County.

I hired James, Bates, Pope and Spivey to help me with a merger. And the law firm, under the direction of David Pope, prepared the merger documents and I became a majority stockholder of Houston Steel in that initial merger by merging Blount and Houston together. And I think that merger actually was formed and completed January 1 of 2003, is my recollection, but I am pretty sure that is right.

Transcript at 218-19.

        As Mr. Farris stated, he became the majority stockholder in the merged entity which continued under the name "Houston Steel, Inc." After the merger, Houston Steel,

18

Inc. continued its steel fabrication and steel erection under contracts it had before the merger and under later acquired contracts.

Mr. Farris testified, "Now, Houston Steel, when we merged, we had to go and take all of the Blount Rigger & Erector contracts that we had and have them renamed with people as Houston Steel." Transcript at 228. He added, "So therefore the backlog that Houston Steel didn't have when I bought them, all of a sudden they had four million dollars worth of work that had to be worked off in that name and not take on any more work." Transcripts at 228-29.

The assets of Blount Riggers and Erectors became the assets of Houston Steel, Inc. Blount Riggers and Erectors' contracts became Houston Steel Inc.'s contracts. Blount Riggers and Erectors' employees became Houston Steel Inc.'s employees. Mr. Farris explained:

> Q.    Let me ask you this, though: Before that date, since Blount Riggers had merged with Houston Steel, Inc., Houston Steel, Inc. was doing both fabrication and erection?
> A.    When the companies merged, Houston Steel, Inc. was doing both work with Blount Rigger employees. That is correct.

Transcript at 287-88.

Mr. Farris added later, "Oh, we had some vans full of tools that Blount Riggers & Erectors originally brought into the original merged companies, drills, some big steel plate drills, big plasma cutters, things of that nature." Transcript at 333. And he added:

> Q.    Okay. And then those assets remained Chuck Farris assets while they were used by Blount?
> A.    I sold them to Blount. At sometime in the future, they became Blount Tools – Blount Riggers & Erectors Tools and Supplies, which then merged into Houston Steel –

Transcript at 333-34.

Houston Steel, Inc. conducted business at 224 Highway 49 South in Byron, Georgia. The facility is situated on six acres. It has a main building that is sixty-five feet wide, fifty-five feet tall, and nine hundred feet long. The facility also has a separate, detached small office, a nine thousand, five hundred square foot paint shop and mechanic shop, and two, double-wide trailers which served as the main office. Mr. Farris testified:

19

Q.     Would you describe the layout of Houston Steel's facility and how the buildings were situated and where she worked?

A.     Yes.  Yesterday somebody said it was a little shed behind the building.  I don't know where he got that from because Houston Steel sat on six acres of land.  The main building was sixty-five feet wide, fifty-five feet tall and nine hundred feet long.  Adjacent to that building was a small office in front that was detached.  Across the street was a nine thousand, five hundred square foot paint shop, a mechanic shop on the back-end of it and then two, double-wide trailers for a main office that sat on the side of that with a railroad siding that came around a steel-linked fence all the way through.

Transcript at 220-21.

        According to Mr. Farris, Houston Steel, Inc. required many employees.  He testified:

        At probably the middle of 2004, we had more people working at Houston Steel than we did at any other time.  There were approximately ninety people that worked in the factory.  There was approximately a hundred people that worked in the field.  We had a vice-president of the finance who helped write the procedures that were used for accounting.  We had a vice-president of estimating, a vice-president of sales and a vice-president of construction.  All four of those people answered to me.  The accounting folks, for example, I believe they had about six people that worked in that department.  Estimating had three.  Sales had two, and then in construction they had probably a half a dozen, to nine, salaried superintendents that were responsible for the day-to-day field operations.  Each department had an internal procedure that it followed or it was supposed to follow.

Transcript at 324.

        Mr. Farris explained that Houston Steel, Inc. had financial problems from the start.  He did not discover that until after he took over the operation.  Not only did he discover that the corporation had substantially underbid on certain large fabrication contracts that it acquired before the merger, but he also discovered that it had incorrectly represented both the size and collectability of some of its larger accounts receivable.  He testified:

        When we made the purchase, when we made the merger of Houston Steel, it was represented to me by the lawyers that represented Steve Oliver and the Honeycutt Brothers, in a conference room at James, Bates, Pope & Spivey, what their receivables were that they had available as part

20

of their company and what they owed. If I remember correctly, they said they had two hundred and twenty-five thousand dollars in receivables and a hundred and forty thousand or a hundred and fifty thousand dollars in payables. Their problem was is that the last five or six contracts that they had, they got in trouble on them and they didn't have any backlog. They had no work. They had five thousand dollars in the bank or nine thousand dollars in the bank when we actually took them over.

That reporting that they did wasn't true. One of their largest customers was Batts & Cook Construction Company in a little town on the other side, next to Lanett on 85, just as you cross the Georgia line. I forget the name of the community, but Batts & Cook has their headquarters there. There was an invoice in the file for a hundred and some odd thousand dollars. The amount that was owed on the job, according to the records, was zero, that they had paid the job off, but Batts & Cook still owed a hundred thousand and a lawsuit had been filed.

I drive over to West Point, Georgia, to Batts & Cook's headquarters and have a meeting with their people. I think the gentleman's name was Mr. Lynch. And I find out that not only do they not owe us a hundred thousand dollars, they have got a countersuit against Houston Steel for some eighty or ninety thousand dollars that they are suing Houston Steel for.

To make a long story short, I went through, we cleaned it all up, and they actually paid us about seventeen thousand dollars on that deal.

Now, as we went through the rest of the things that were given to us, we found these same sort of irregularities and the biggest one was their estimated cost to complete the Mercer University project. Where they said it was going to cost a couple hundred thousand dollars to finish, it actually cost me nine hundred thousand dollars to finish the steel fabrication on that job and to pay off the claims of delays that people like Mott Plumbing and the HVAC company, the painter, who got delayed in their contract and had to work overtime because of Houston Steel's steel fabrication problems.

Transcript at 226-28.

Because of Houston Steel, Inc.'s financial difficulties, and other financial considerations, in the latter part of 2003 and initial part of 2004, Mr. Farris decided to end Houston Steel, Inc.'s active participation in the steel fabricating and erection business and to create three new entities. One entity was to perform the steel fabrication part of the business. Another entity was perform the steel erection part of the business. A third was to loan money to the other two. Transcript at 228-29.

Houston Steel, Inc. filed a Chapter 7 case, Case No. 05-50328, in the Bankruptcy Court for Middle District of Georgia, Macon Division, on January 27, 2005. While the petition in that case was not admitted into evidence, Mr. Farris conceded that he signed it on behalf of the corporation.[20]  He testified:

> Q.     Would you look at this voluntary petition, please, sir, in the Houston Steel case and, to save time, I will help you.  Question eleven asks you about closed accounts.  See if question eleven doesn't ask you about closed accounts and tell us what you disclosed about closed accounts of Houston Steel, Inc.
> A.     Well, on March 3, when this was signed by Mr. Fricks –
> Q.     And verified by you.  That is your signature on the verification?
> A.     Yes.

Transcript at 273-74.

Mr. Farris specifically admitted at trial that he was in control of Houston Steel, Inc. during the six years preceding the filing of his personal Chapter 7 case on October 25, 2005.  He testified:

> Q.     Okay.  And you were CEO the whole time in 2004?
> A.     Yeah.  It is sort of a misnomer but, yes.  In an LLC, you have a managing partner –
> Q.     I am talking about Houston Steel, Inc.
> A.     Yes, Houston Steel, Inc., I was the CEO at all times.
> Q.     And you were the managing member or managing partner in both of the LLCs?
> A.     Yes.
> Q.     That's Fabricators and Erectors?
> A.     Yes.

Transcript at 338-39.

---

[20] In paragraph 7 of the complaint that it filed in Adversary Proceeding No. 06-00102, Airgas alleged that "Houston Steel, Inc. ("Houston Steel"), a Georgia Corporation, formerly engaged in the business of steel fabrication and erection, filed a Chapter 7 Bankruptcy Case No. 05-50328-JDW in the United States Bankruptcy Court for the Middle District of Georgia on January 27, 2005."  Complaint to Determine Dischargeability of Debt and Objection to Discharge of the Debtor filed by Oxygen Service Company, Inc. (now Airgas South, Inc.) on May 22, 2006, Adversary Proceeding No. 06-00102.  In paragraph 7 of the answer that he filed in that adversary proceeding, Mr. Farris admitted the allegations contained in paragraph 7 of Airgas' complaint.  Answer filed by Defendant Charles Pierce Farris, Jr. on June 21, 2006, in Adversary Proceeding No. 06-00102.  But, see the Court's discussion at the end of this opinion regarding "judicial notice".

There were numerous documents admitted at trial that confirm Mr. Farris' control of Houston Steel, Inc. during 2003 and 2004, a time within six years of the filing of his personal bankruptcy petition. Those documents include invoices, bills, and statements issued to the corporation by its vendors and creditors. General Steel Exs. 47 (many), 52, 55, 59, 60, 63, 65, 66-68, 71, 75, 76, 78 (several), 80, 89-94, 95 (several), 96-99, 102, 105-107, 109-111, 112 (several), 113-120, 121 (several), 122-125, 127-136, 138, 139, 141, 143, 144-146, 149, 151-159, 161, 165 (many), 166, 167, 171-180, 187, 188 (several), 189 (several), 190 (several), 191-195, 197-200, 202 (several), 203-205, 208 (several), 209, 230, 233-236, 238, and 239 (several).

They also include purchase orders issued by the corporation (General Steel Exs. 48, 57, 71, 109, 187, 188, 189 (several), 203, and 219); checks written on the corporation's accounts or check stubs otherwise showing activity on those accounts (General Steel Exs. 7, 11, 108, 162, 163, 170, 173, 179, 182, 186, 210, 219, 240, 241, 242, and 257); correspondence (General Steel Exs. 1, 4, 10, 14, 15, 50, 54, 170, 210); and other documents (General Steel Exs. 51, 61, 103, 104, 147, 148, 173, 186, 219, 239, 285, and 286). Particularly illustrative is the corporation's April 2004 general ledger which details much of its business activities in that month. General Steel Exs. 285 & 286.

The above conclusively establishes that within the six years preceding the filing of Mr. Farris' personal Chapter 7 bankruptcy petition, Mr. Farris was an officer, director, or managing executive of Houston Steel, Inc., a business corporation; that he owned five percent or more of the voting or equity securities of that corporation; and that Houston Steel, Inc. was engaged in the operation of a business during those six years. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in that company's business in response to Question 18 of his <u>Statement of Financial Affairs</u>.

### 4. Damore-Abraham Holding Company, LLC,

In the latter part of 2003 and early 2004, Mr. Farris decided that the steel fabrication part of his business should be conducted separately from the steel erection part of the business. He testified, "The erector would not only work for the fabricator that we owned but it would work for other fabricators or general contractors so we could keep all of our crews and equipment busy." Transcript at 229. He added:

> And another thing, when a fabricator takes on a contract to fabricate and erect steel, it gets ten percent retainage withheld from the total contract. When a fabricator takes a purchase order just to supply material, it doesn't get retainage held for it. Just the steel erection side, the labor portion on site gets the ten percent retainage. So it was a further business decision to split them so we could save the retainage on the fabrication part of the contract.

23

Transcript at 229.

In the latter part of 2003 and initial part of 2004, Mr. Farris began creating Houston Steel Erectors, LLC, the new steel erection company; Houston Steel Fabricators, LLC, the new steel fabrication company; and Damore-Abraham Holding Company, LLC, the company that would loan money to those two.

All three companies were formed in the state of Georgia on March 23, 2004. General Steel Exs. 288, 290, and 291. Each conducted its business, under Mr. Farris' control, out of the Houston Steel, Inc. facility at 224 Highway 49 South in Byron, Georgia.

According to the company's "Operating Agreement," the members of Damore-Abraham were Mr. Farris, who owned 81 percent of the company and Dr. Edward Damore and Kimberly Damore, as trustees of the Damore 2002 Family Trust, who owned 19 percent. Damore Ex. 1. Mr. Farris was the president. Id.

Mr. Farris testified that the purpose of Damore-Abraham, "was to provide overhead assistance, loans, insurance, a few other little odds and ends as oversight to the company. That was the purpose so that the two operating entities focused on steel and construction." Transcript at 341.

Dr. Edward Damore and his wife, Kimberly Damore, invested $575,000 into Mr. Farris' steel fabrication and erection enterprises. The Damores made the investment in two installment. The first was for $375,000. Transcript at 41-52. The second was for $200,000. Transcript at 42. According to Mr. Lee, attorney for Two by Two, the funds were paid directly to Mr. Farris, through a limited liability company set up by the Damores for that purpose. Transcript at 87-88. The name of the limited liability company was "Two by Two, LLC." Mr. Farris' characterized the funds as payment for the Damores' units in Damore-Abraham. Transcript at 62.

Two by Two was given a security interest in certain equipment to secure the $200,000 loan. It is impossible to tell from the evidence who or what entity owned the equipment pledged to Two by Two, or whether the equipment was actually transferred to Two by Two absolutely rather than just pledged. The UCC-1 filing lists Damore-Abraham as the owner/debtor and Two by Two as the secured party. Damore Ex. 3. The document styled "Sale/Leaseback of Equipment for Houston Steel Fabricators, L.L.C." describes Two by Two as owner of the equipment, by way of transfer from Houston Steel Fabricators, LLC. Damore Ex. 4. In an email dated April 27, 2005, to Dr. Damore, Mr. Farris claimed he owned the equipment personally. Damore Ex. 5.

Mr. Farris testified about the subject:

Q.      I see. So it is your testimony that your amended schedules are going to show indeed that you are the owner of certain equipment that is pledged to Dr. Damore?

24

A.    No, it will not show that.

Q.    Why not?

A.    Because the equipment, certain equipment that was owned by
Blount Riggers & Erectors that went through a merger in 2002 with
Houston Steel that was split off to Houston Steel Erectors, which
became the erection company of the fabrication side, I owned that
company independent of the other companies and that equipment
was in there first.

Q.    Now that is the equipment that you pledged to Dr. Damore?

A.    Exactly.

Transcript at 66-67.

Deciding that issue is not necessary to the immediate controversy. It is sufficient
to recognize that $200,000 of Two by Two's cash payment to Damore-Abraham through
Mr. Farris was, on paper, secured by certain equipment whether owned by Mr. Farris or
the entities owned by him.

Mr. Farris also testified that during Damore-Abraham's brief existence, the
company loaned the money it received from the Damores through Two by Two to
Houston Steel Erectors and Houston Steel Fabricators, by directly paying the bills which
those companies could not pay. He testified:

Q.    But then Damore Abraham started paying bills of Houston Steel, of
Houston Steel Fabricators directly?

A.    Through loans that it made to those entities, yes.

Transcript at page 341. He added:

Q.    Okay. Putting aside whether it was right, wrong, good, bad,
indifferent, I mean you admit that that occurred, Damore Abraham
checks were used to pay bills of Houston Steel, Inc.?

A.    That's correct.

Q.    And of Houston Steel Fabricators?

A.    We did.

25

Transcript at 341-42. He also explained, "Houston Steel Erectors would erect steel for Damore Abraham. It would borrow money from Damore Abraham. So it had a contract relationship and a loan relationship." Transcript at 270-71.

With Houston Steel Erectors' and Houston Steel Fabricators' financial problems, Damore-Abraham filed a bankruptcy case in the Bankruptcy Court for Middle District of Georgia, Macon Division, Case No. 05-50330. General Steel Ex. 294. While no evidence was presented to show the precise filing date, the various orders entered in that case that were admitted in this case. Those document cumulatively form General Steel Ex. 294 and are dated October 12, 2005, and December 23, 2005. Those orders refer to other orders entered in that case on June 30, 2005, August 16, 2005, and July 25, 2005. From that evidence, the Court infers that Damore-Abraham filed its case before June 30, 2005.[21]

Mr. Farris was unsure of his position in Damore-Abraham. He testified:

Q.    How about Damore Abraham, were you the managing member of Damore Abraham?

A.    I think Rita was of Damore Abraham and, again, I am almost positive that's right but, if I had the operating agreement here, I could tell you.

Transcript at 339.

In contrast, Mr. Farris is named the company's president in the "Operating Agreement," but clearly, Mr. Farris was controlling that company. The sole function of Damore-Abraham was to spend money, that is, it was a vehicle for Mr. Farris to use the money invested by the Damore's to pay the bills of Houston Steel, Inc., Houston Steel Fabricators, and Houston Steel Erectors. Of the 79 checks written on that company's bank account which were admitted into evidence, 59 bear his signature; 3 bear the signature of his employee Jennifer Bowden; and 17 bear his authorized facsimile signature (see General Steel 20, Mr. Farris' signature card at Gulf Coast Bank & Trust Company). See General Steel Exs. 6, 16, 19, 56, 59, 63, 64, 68, 69, 70, 72, 75, 76(2), 78, 80, 85, 86, 93, 95, 97, 98, 99, 100, 103, 106(2), 111, 113, 114, 117, 118, 121, 161, 165, 168, 170, 175, 178, 179, 180, 181, 183, 190, 191, 194, 196, 200, 201, 203, 208, 211, 213, 215, 217, 219, 220, 221, 223, 224, 225, 230, 232, 235, 236, 237, 250, 252(8), 253, 254, 258, and 259. The checks which were written between the end of July 2004 and the first part of November 2004, furthermore serve, in addition to Mr. Farris' testimony, to prove that Damore-Abraham, with Mr. Farris at its helm, was

---

[21] See this Court's discussion at the end of this opinion of why it did not take judicial knowledge of the Damore-Abraham bankruptcy filed Middle District of Georgia, Macon Division, Bankruptcy Case No. 05-50330.

engaged in the operation of a business during that period of time, and thus within the six years preceding his personal bankruptcy filing.

The above conclusively establishes that, within the six years preceding the filing of Mr. Farris' personal bankruptcy case, Mr. Farris was an officer, director, or managing executive of Damore-Abraham Holding Company, LLC, a limited liability company engaged in the operation of a business; that he owned five percent or more of the equity interest of that company; and the company was engaged in the operation of a business during those six years. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in that company's business in response to Question 18 of his <u>Statement of Financial Affairs</u>.

### 5. Houston Steel Erectors, LLC and
### 6. Houston Steel Fabricators, LLC

As discussed above, when Houston Steel, Inc. had financial problems, Mr. Farris chose to continue its business under Houston Steel Erectors and Houston Steel Fabricators. As stated above, both of those businesses were formed in the state of Georgia on March 23, 2004.

Mr. Farris testified that he bought tools and equipment from Houston Steel, Inc. and sold them to Houston Steel Erectors and Houston Steel Fabricators in exchange for his ownership interests in those companies. From their inception, until their demise, Houston Steel Erectors performed the erection part of the business while Houston Steel Fabricators performed the fabrication part of the business. Mr. Farris ran both operations, along with the operations of the third company, Damore-Abraham.

Unfortunately, the Court does not have any documentary evidence of the operating agreements of Houston Steel Erectors and Houston Steel Fabricators. Therefore, it does not know who their members were, what the interests of the members were, or who the officers or managing members were. However, Mr. Farris testified that he was the chief executive officer of both companies. He testified that Houston Steel Erectors was owned by his son, Henry Knight; Jonathan Thompson; and himself. And, he testified that Houston Steel Fabricators was owned by Damore-Abraham. Transcript at 226-30.

At trial, Mr. Farris admitted that he controlled both Houston Steel Fabricators and Houston Steel Erectors during the six years before filing his Chapter 7 case on October 25, 2005. He testified:

Q.     Okay. And you were CEO the whole time in 2004?

A.     Yeah. It is sort of a misnomer but, yes. In an LLC, you have a managing partner –

27

Q.     I am talking about Houston Steel, Inc.

A.     Yes, Houston Steel, Inc., I was the CEO at all times.

Q.     And you were the managing member or managing partner in both of the LLCs?

A.     Yes.

Q.     That's Fabricators and Erectors?

A.     Yes.

Transcript at 338-39.

        In addition to Mr. Farris' testimony and express admissions, exhibits admitted at trial confirm that he operated <u>Houston Steel Fabricators</u> during 2004 within six years of filing his personal bankruptcy petition.  Those exhibits include:

        invoices and bills issued to the company by its vendors and creditors (General Steel Exs. 56, 72, 73 (several), 83, 86 (several), 100 (several), 105-107, 168, 175, 183-185, 201, 206, 207, 211, 212, 217, 221 (several), 22 (several), 223, 226, 231, 232 and 237 (several));

        purchase orders issued by the company (General Steel Exs. 48, 77, 81, 83 (several), 86 (several), 101, 118, 181, 195, 197, 198, 202, 206, 211, 218, 221 (several), 222 (several), and 231);

        checks written on the company's bank account and check stubs reflecting checking account activity (General Steel Exs. 8, 61, 62, 65-68, 70, 71, 76, 82, 85, 89, 90, 92, 94, 95, 105, 109, 110, 112, 113, 115-118, 120, 121, 160, 164-168, 171, 172, 179, 181, 187-189, 193, 194, 201, 203, 205, 208, 210, 213, 220, 224, 229, 233, 235, 236, 238, 239, 242 (several), 243-249, 264, and 266-270);

        correspondence (General Steel Exs. 2, 5, 17, 43, 62, 74, 84, 107, 174, 200, 202, 219, 228, 231, 234, and 238);

        and other documents (General Steel Exs. 12, 13, 61, 70-72, 77, 79, 86, 96, 97, 105, 106, 108, 116, 119, 121, 160, 165, 166, 176, 178, 184, 185, 207, 212, 213, 222, and 233).

        Similarly, in addition to Mr. Farris' testimony and express admissions, exhibits admitted at trial confirm that he operated <u>Houston Steel Erectors</u> during 2004 within six years of filing his personal bankruptcy petition.  Those exhibits include:

28

invoices and bills issued to the company by its vendors and creditors (General Steel Exs. 88, 184, 185 (several));

purchase orders and invoices issued by the company (General Steel Exs. 82, 164, 192, 201, 247, and 249);

checks drawn on the company's account, and check stubs reflecting checking account activity, and blank checks reflecting the existence of checking accounts  (General Steel Exs. 62, 70, 84, 107, 166, 169, 174, 192, 199, 200, 202, 204, 209, 215, 216, 222, 234, and 271-277);

correspondence (General Steel Ex. 166); and other documents (General Steel Exs. 70, 109, 177, 192, and 199).

By the latter part of 2004, and the beginning of 2005, all of Mr. Farris' business enterprises had financial problems.  Houston Steel Fabricators filed a Chapter 11 petition in the Bankruptcy Court for Middle District of Georgia, Macon Division, on February 3, 2005, Case No. 05-50456.  That case was converted to Chapter 7 on March 8, 2005.[22]  And, according to Mr. Farris, Houston Steel Erectors was out of business but had not filed bankruptcy.

The above conclusively establishes that within the six years immediately preceding the filing of Mr. Farris' personal bankruptcy case, Mr. Farris was an officer, director, or managing executive of Houston Steel Erectors, LLC and Houston Steel Fabricators, LLC, each a limited liability company engaged in the conduct of a business,

_____

[22] In paragraph 8 of the complaint that it filed in Adversary proceeding No. 06-00102, Airgas alleged the following:

Houston Steel Fabricators, LLC ("Fabricators"), a Georgia limited liability company, formed by the principals of Houston Steel in or about mid-2004. Fabricators was engaged in the same business as Houston Steel from the same location and utilizing the same inventory, equipment, supplies, employees and contracts.  Fabricators filed a voluntary Chapter 11 Bankruptcy Case No. 05-50456-JDW in the United States Bankruptcy Court for the Middle District of Georgia on February 3, 2005.  Fabricators Chapter 11 Bankruptcy Case was converted to a chapter 7 case on March 8, 2005.

Complaint to Determine Dischargeability of Debt and Objection to  Discharge of the Debtor filed by Oxygen Service Company, Inc. (now Airgas South, Inc.) on May 22, 2006, in Adversary Proceeding No. 06-00102.

In paragraph 8 of the answer that he filed in that adversary proceeding, Mr. Farris admitted the allegations contained in paragraph 8 of Airgas' complaint.  Answer filed by Defendant Charles Pierce Farris, Jr. on June 21, 2006, in Adversary Proceeding No. 06-00102.

and that those companies were engaged in the operation of businesses during those six years. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in those companies' business in response to Question 18 of his <u>Statement of Financial Affairs</u>.

### 7. CPF Leasing Company

According to his testimony, Mr. Farris began operating a sole proprietorship in 2004 which he called "CPF Leasing Company."[23]  CPF's business was to lease equipment to Houston Steel Erectors and Houston Steel Fabricators, as well as other unrelated steel erecting and fabricating businesses. He said that he started the enterprise with equipment, including vans full of tools, drills, some big steel plate drills, and big plasma cutters, that he obtained through the Blount Riggers and Erector and Houston Steel, Inc. merger. He claims that the enterprise never really got off the ground because of the financial demise of his other companies during that same year. It is apparent, however, that, under the auspices of "CPF Leasing Company," Mr. Farris received substantial payments from his other companies. The evidence demonstrates:

1.  As "CPF Leasing Company," Mr. Farris billed Houston Steel, Inc. $20,237 on April 1, 2004. In response to that invoice, Check No. 1418 was written to him in that amount by Houston Steel, Inc. that same day. General Steel Ex. 240.

2.  A check was written to "CPF Leasing Company" by Houston Steel Fabricators on June 14, 2004, for $5,000 (Check No. 4038) as a "loan repayment." General Steel Ex. 242.

3.  A check was written to "CPF Leasing Company" by Houston Steel Fabricators on June 25, 2004, for $20,237 (Check No. 50160). General Steel Ex. 242.

4.  As "CPF Leasing Company," Mr. Farris billed Houston Steel Erectors $4,500 in June 2004. In response to that invoice, Check No. 50038 was written to "CPF Leasing Company" in that amount by Houston Steel Fabricators on June 15, 2004. General Steel Ex. 243. The "description" given on the check register for the payment is "misc."

5.  A check was written to "CPF Leasing Company" by Damore-Abraham dated September 14, 2004, for $10,000 (Check No. 3214). General Steel Ex. 250.

_____

[23]Mr. Farris' full name is "Charles Pierce Farris."

6.  Four checks were written to "CPF Leasing Company" totaling $60,000.04 by Damore-Abraham, each dated September 21, 2004.  One was for $13,154.37 (Check No. 3254); another for $29,611.05 (Check No. 3255); another for $16,405.43 (Check No. 3256); and another for $829.19 (Check No. 3257).  General Steel Ex. 251.

7.  Eight checks were written to "CPF Leasing Company" totaling $90,286.55 by Damore-Abraham, each dated September 23, 2004.  One was for $11,321.55 (Check No. 3285); another was for $9,800.35 (Check No. 3286); another was for $16,401.58 (Check No. 3287); another was for $13,555.06 (Check No. 3288); another was for $7,013.40 (Check No. 3289); another was for $13,000 (Check No. 3290); another was for $10,156.06 (Check No. 3291); and another was for $9,038.55 (Check No. 3292).  General Steel Ex. 252.

8.  A check was written to "CPF Leasing Company" by Damore-Abraham dated October 14, 2004, in the amount of $15,000 (Check No. 3388).  General Steel Ex. 253.  The "description" given on the check stub for the payment is "equipment lease."

9.  A check was written to "CPF Leasing Company" by Damore-Abraham dated October 27, 2004, in the amount of $12,000 (Check No. 3435).  General Steel Ex. 254.  The "description" given on the check register for the payment is "lease payment."  The check register reflects that payment of the check was stopped by Mr. Farris for the reason that he had received a wire transfer of the money instead.  The stop payment authorization to the bank is signed by Mr. Farris in his normal handwriting and the reason given on the authorization for stopping payment of the check was "replace with wire transfer."

Mr. Farris claimed at trial that only one of the checks that appears in the exhibits, which he did not specifically identify, was cashed because his companies did not have funds to honor the other checks.  Indeed, General Steel Exhibits 240, 242, and 243 contain copies of the check register only, not copies of the checks purportedly written to Mr. Farris.  And the checks contained in General Steel Ex. 251 were unsigned.  On the other hand, the check marked as General Steel Ex. 250 was signed by Mr. Farris in the same manner he ordinarily signed documents.  Furthermore, the checks contained in General Steel Exs. 252, 253, and 254 bear Mr. Farris' authorized facsimile signature.

As discussed above, because of Mr. Farris' three felony conviction, he has little credibility as a witness when his testimony conflicts with other evidence; however, for purposes of the present discussion, whether or not Mr. Farris cashed all or some or just one of the checks contained in those exhibits is immaterial.  What matters is that those checks to "CPF Leasing Company," along with Mr. Farris' testimony on the subject, prove conclusively that he was engaged in business under that name as a sole

31

proprietorship during the six years preceding the filing of his personal Chapter 7 bankruptcy case. That conclusion is confirmed by the 15 checks drawn by Mr. Farris, and his employee, Jennifer Bowden, from August 24, 2004, through November 24, 2004, on the two bank accounts he maintained in the name of "CPF Leasing" at Rivoli Bank in Macon, Georgia and CB&T Bank of Middle Georgia. General Steel Exs. 101, 185, 279 and 280.

This evidence establishes that within the six years preceding the filing of his personal Chapter 7 case, Mr. Farris operated a sole proprietorship. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in that company's business in response to Question 18 of his <u>Statement of Financial Affairs</u>.

### 8. Red Rock Steel Erectors & Fabricators, LLC

According to his testimony, Mr. Farris formed Red Rock Steel Erectors & Fabricators, LLC, for the express purpose of carrying on the business of Houston Steel Erectors. The records of the Alabama Secretary of State's Office reflect that Red Rock was formed in Alabama on February 24, 2005. General Steel Ex. 287. Mr. Farris testified, "It is a company that I own." Transcript at 270. He characterized it as Houston Steel Erectors' "successor," formed specifically to "[take] over the work that Houston Steel Erectors was doing." Transcript at 270 (parenthetical added).

Mr. Farris testified that Red Rock performed its work with tools and equipment he purchased from Houston Steel Erectors and Houston Steel Fabricators and then sold to Red Rock, including some of the tools and equipment he had used in his "CPS Leasing Company" sole proprietorship. The record contains copies of some 23 or so checks drawn by Mr. Farris on Red Rock's checking account at Merchants Bank in Cullman, Alabama, from March 22, 2005, through April 13, 2005, and another two checks drawn by him on Red Rock's checking account at People's Southern Bank in Clanton, Alabama on April 25, 2005, and May 11, 2005. General Steel Exs. 281-284. According to Mr. Farris, Red Rock is now out of business.

The above conclusively establishes that within the six years immediately preceding the commencement of the present case, Mr. Farris was an officer, director, or managing executive of Red Rock Steel Erectors & Fabricators, LLC, a limited liability company engaged in the operation of a business; that he owned five percent or more of the equity interest of that company; that Red Rock was engaged in business during those six years; and that Mr. Farris owned his interest in that company when he filed his personal bankruptcy petition. Therefore, Mr. Farris was duty bound to divulge that information and to describe his participation in that company's business in response to Question 18 of his <u>Statement of Financial Affairs</u>.

32

### 9. Conclusion to Mr. Farris' Business Operations
### within Six Years before He Filed the Current Case

Not only did Mr. Farris conduct business through at least eight companies during the six years before he filed his bankruptcy case, he was intimately involved in those businesses. Either Mr. Farris did not understand the question on his bankruptcy petition, which this Court strongly rejects due to Mr. Farris' obvious intellectual and business capabilities, or he chose to answer the question "None" rather than divulge his involvement with the eight companies. Based on the evidence, the Court finds the latter. Under bankruptcy law, Mr. Farris was required to respond honestly to Question 18 of his Statement of Financial Affairs. He did not.

### B. Mr. Farris Concealed or Failed to Keep Records
### in the Houston Steel, Inc. and Houston
### Steel Fabricators Bankruptcy Cases

### 1. Facts Demonstrating Concealment or Failure to Keep Records

### a. Mr. Edwards' Testimony

Mr. Christopher Edwards, the certified public accountant appointed by the bankruptcy court in the Middle District of Georgia to serve as the trustee's accountant in both the Houston Steel, Inc. and Houston Steel Fabricators bankruptcy cases, has nineteen years of experience serving in bankruptcy cases. Over those years, he has been appointed to serve in about 2,000 bankruptcy cases. He testified that about 150 of those cases, "have been detailed cases involving fraud, preferences, valuation work." Transcript at 90. His practice involves a great deal of work in preparation of litigation, which he referred to as "valuation of forensic work." Transcript at 89. In fact, he has received special training and accreditation in that line from the National Association of Certified Valuation Analysts. He was awarded the status of a "Certified Valuation Analyst" from that professional association which, according to him, "is one of the leading credentials for professional valuation." Transcript at 89-90.[24]

Mr. Edwards testified that when appointed to serve in a bankruptcy case his initial act is to retrieve the records of the debtor's operations from whomever has them. He acts as quickly as possible in contacting the debtor to obtain a variety of organizational, financial, and accounting data including tax returns, general ledgers, trial balances, aged payables reports, aged receivables reports, corporate documents, and minute books.

---

[24] Based on Mr. Edwards' professional education, certifications, and extensive experience, the Court recognizes him as a expert on the subject of the adequacy of records in a bankruptcy case involving a debtor who was engaged in the operation of a business.

33

Mr. Edwards was appointed in the Houston Steel, Inc. case in March 2005. A couple of months later, he visited Mr. Farris at the corporation's facility in Byron, Georgia. He received very few records from Mr. Farris. While he had requested information including tax returns, general ledgers, trial balance, accounts payable, accounts receivable, and vendor files, he received only a collection of prior tax returns, one general ledger for April 30, 2004, one aged payables listing, and one aged receivables listing.

While Mr. Edwards had anticipated retrieving boxes of records from Mr. Farris pertaining to Houston Steel, Inc.'s business operations, the total of the records he receive was **no more than a single stack six or seven inches tall**. Mr. Farris told him that those were the only records that were available and that the others, which had been stored in a shed behind the office complex, were destroyed by water damage. Mr. Edwards brought the records he received from Mr. Farris with him to court for the trial on the pending matters.

Mr. Edwards received most of these records from a computer Mr. Farris had at the companies' site. Mr. Farris told him that all of the company's computer records were in that computer, but according to Mr. Edwards, the only records he saw on the computer were the ones he received, or at least the only records Mr. Farris showed him. Mr. Edwards testified:

Q.    What records did you receive from Houston Steel? First, do you have those records with you today?

A.    I do.

Q.    And describe for the court the volume of records which you received?

A.    Very little. Again, as I said to the court earlier, I request a whole variety of information, tax returns, general ledgers, trial balance, accounts payable, accounts receivable. I want to see vendor files so that I can work on preference and insider conveyance matters.

What I received was a collection of prior tax returns, one general ledger, transaction history dated April 30, 2004, which is over a year prior to my visit, one aged payables listing of Houston Steel and one aged receivable listing of Houston Steel. That is essentially all that I was able to receive because I was told that was all that was available to be provided.

Q.    And who told you that was all that was available?

A.    Mr. Farris.

34

Q.      What about computer records?

A.      Mr. Farris maintained a computer behind his desk on a small credenza, had a printer next to it, and he said that what computer records there were, were in that computer. And so I stood beside him. He sat and I stood to his right, and we pulled up as much as we could on records, and I asked Mr. Farris, if he will recall even, to just print what you have got, and that's where I got the general ledger that I referred to dated April 30, '04, and the aged payables and the aged receivables.

**The sum total of the data that I took out probably wouldn't be a stack more than six or seven inches tall. I was expecting to bring boxes back**.

Q.      Did Mr. Farris have any – did you ask Mr. Farris about the absence of records?

A.      I did.

Q.      And what did he say?

A.      His explanation to me on the deficiency of the records was that they were destroyed in a casualty loss or water damage in his storage shed behind the office complex that I referred to earlier.

Q.      Water damage?

A.      Yes, sir.

Q.      For either company did you see minute books reflecting corporate activity?

A.      No.

Q.      Let me ask you this. We have kind of jumped ahead. Did you later become appointed as the accountant for Houston Steel Fabricators?

A.      I did.

Q.      And did you receive from the attorney for the trustee all records that were produced by Mr. Farris in connection with that proceeding?

35

A.      I did, and I was surprised at the increase in volume, though these records are still far deficient for organizational records, particularly when you consider the number of entities involved, and I can discuss at an appropriate time how many entities are encompassed in these records, but it is two and a half large boxes, which we have in the courtroom today, mostly consisting of selected, random, vendor files. **These were the very records I asked for when I visited Mr. Farris in the early summer, late spring, of 2005, and I was a little dismayed to see that they did exist, even though the sum total of those is still far deficient for what should be expected to be on hand and available**.

Q.      Okay. Now what do you mean by the Fabricators' records obtained by the trustee in that case consisted mainly of vendor files?

A.      Invoices from suppliers and vendors and purchase orders from the Houston Steel related entities to vendors requesting information. **But the reason why I say it is pertinent and relevant in regard to my initial request to Mr. Farris of Houston Steel records is that contained in these few boxes of records is at least eleven entities, one of which, of course, is Houston Steel, and so those records could have and should have been provided to me initially**.

Q.      So you later found, among the Fabricators' records, records that pertained to business activities of Houston Steel, not Fabricators? You found Fabricators and Houston Steel?

A.      Right.

Q.      And you also found other Farris related entities included in those documents?

A.      That is correct, ten or twelve, at least.

Transcript at 96-99 (emphasis added).

The April 30, 2004, general ledger Mr. Edwards obtained from Mr. Farris in their only meeting listed 16 open bank accounts. Only two of those had been listed on the corporation's bankruptcy petition. The 16 accounts were:

1st Community Bank; <u>two accounts</u>, payroll and operating; both with "0.00" beginning and ending balances;

36

Pinnacle Bank Vestavia with "0.00" beginning and ending balances;

SunMark; <u>two accounts</u>, payroll and operating; the first with "0.00" beginning and ending balances; the latter with a $15 beginning balance and a "0.00" ending balance;

Bank of America with "0.00" beginning and ending balances;

AIG Bank of America with "0.00" beginning and ending balances;

BB&T; <u>two accounts</u>, payroll and operating; the first with "0.00" beginning and ending balances; the latter with a $42,484.15 beginning balance and a "0.00" ending balance;

Security; <u>two accounts</u>, payroll and operating; the first with a $58,913.92 beginning balance and a "0.00" ending balance; the latter with a $3,871.49 beginning balance and a "0.00" ending balance;

New Southern; <u>two accounts</u>, "Ge. Acct" and payroll; both with "0.00" beginning and ending balances;

Wells Fargo Bank; one account with a beginning balance of $60,602.76 and an ending balance of $30;

Wachovia Bank with a $1,100 beginning balance and a "0.00" ending balance;

Union State Bank; one account shown with a beginning balance of "0.00" and that is where the document abruptly stops.

General Steel Ex. 285.

In contrast, the documents retrieved by Mr. Edwards did not include any bank records about those accounts or other records illustrating the financial transactions conducted through them.

Mr. Edwards was later appointed as the accountant for the trustee in the Houston Steel Fabricators case after it was converted to Chapter 7. He received all of the records that were produced by Mr. Farris in connection with that case. Interestingly, the records Mr. Farris produced in that case pertained to 11 of his entities, not just Houston Steel Fabricators. As above-quoted, part of Mr. Edwards' testimony reveals that he was surprised to find that these "new" documents included some of the records he had previously asked for in connection with the Houston Steel, Inc. bankruptcy in 2005. He was dismayed to find that those records actually existed as Mr. Farris had told him that they had been destroyed. Even still, the total of the records produced

which related to Houston Steel, Inc., including the records produced in connection with the Houston Steel Fabricators' case, were, according to Mr. Edwards, far less than what there should have been given the size of that enterprise.

The documents that were produced by Mr. Farris in the Houston Steel Fabricators case consisted primarily of selected, random, vendor files, including invoices from suppliers and vendors and purchase orders from the Houston Steel related entities to vendors requesting information. They also included some checks used by the Houston Steel related entities to pay those vendors, some checks that were written to vendors but apparently never sent, some checks that were written to vendors but returned for having been drawn on insufficient funds, some checks marked "VOID" and intended to be used for the purpose of ordering other checks, and excerpts from the companies' check registers showing checks having been drawn, returned, "voided" and "replaced."

The only two bank accounts listed by Houston Steel Fabricators in its bankruptcy petition were at Suntrust in Macon, Georgia, and Colonial Bank in Birmingham, Alabama. The checks and excerpts from check registers Mr. Edwards did obtain from Mr. Farris in connection with the Houston Steel Fabricators' case reflect that Houston Steel Fabricators had seven more bank accounts that were not listed in its bankruptcy petition. Those were accounts at Comerica Bank in California; The Bank of Perry in Perry, Georgia; Rivoli Bank & Trust of Macon, Georgia; AmSouth Bank; Capital City Bank of Macon, Georgia; and Wachovia. Each is discussed below.

### (1) Comerica Bank

Thirteen checks were written during the year preceding Houston Steel Fabricators' bankruptcy filing on an account maintained by that entity at Comerica Bank in California (account number 1892658640) between June 10, 2004, and July 8, 2004: check 50207, dated 6/30/04, signed by Mr. Farris (General Steel Ex. 8); check number 50127, dated 6/22/04, signed by Mr. Farris (General Steel Ex. 61); check number 50015, dated 6/11/04, signed by Mr. Farris (General Steel Ex. 82); check number 50030, dated 6/14/04, signed by Mr. Farris (General Steel Ex. 94); check number 50137, dated 6/22/04, signed by Mr. Farris (General Steel Ex. 109); check number 50240, dated 7/08/04, signed by Mr. Farris (General Steel Ex. 164); check number 50134, dated 6/22/04, signed by Mr. Farris (General Steel Ex. 171); check number 50139, dated 6/22/04, signed by Mr. Farris (General Steel Ex. 172); check number 50200, dated 6/30/04, signed by Mr. Farris (General Steel Ex. 173); check number 50010, dated 6/10/04, signed by Mr. Farris (General Steel Exs. 187 & 268); check number 50000, dated 6/10/04, signed by Mr. Farris (General Steel Ex. 188); check number 50003, dated 6/10/04, signed by Mr. Farris (General Steel Ex. 189); and check number 50053, dated 6/16/04, signed by Mr. Farris (General Steel Ex. 244).

## (2)  The Bank of Perry

Eleven checks were written during the year preceding Houston Steel Fabricators' bankruptcy filing on an account maintained by that entity at The Bank of Perry in Perry, Georgia (account number 004 35 594) from July 13, 2004 through August 20, 2004: check number 4143, dated 7/28/04, signed by Mr. Farris (General Steel Ex. 66); check number 4138, dated 7/26/04, signed by Mr. Farris (General Steel Ex. 70); check number 6164, dated 7/26/04, signed by Mr. Farris (General Steel Ex. 70); check number 4050, dated 7/13/04, signed by Mr. Farris (General Steel Ex. 71); check number 4135, dated 7/22/04, signed by Mr. Farris (General Steel Ex. 96); check number 4051, dated 7/13/04, signed by Mr. Farris (General Steel Ex. 121); check number 4100, dated 7/20/04, signed by Mr. Farris (General Steel Ex. 168); check number 4091, dated 7/20/04, signed by Mr. Farris (General Steel Ex. 173); check number 4114, dated 7/21/04, signed by Mr. Farris (General Steel Ex. 181); check number 2070, dated 8/20/04, signed by Mr. Farris (General Steel Ex. 264); and check number 4086, dated 7/19/04, signed by Mr. Farris (facsimile) (General Steel Ex. 266).

## (3)  Rivoli Bank & Trust

Eleven checks were written during the year preceding Houston Steel Fabricators' bankruptcy filing on an account maintained by that entity at Rivoli Bank & Trust of Macon, Georgia (account number 010012989) on August 19, 2004, and August 20, 2004: check number 2049, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 68); check number 2050, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 76); check number 2037, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 85); check number 2051, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 89); check number 2054, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 113); check number 2069, dated 8/20/04, signed by Mr. Farris (General Steel Ex. 121); check number 2055, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 165); check number 2056, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 168); check number 2059, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 201); check number 2060, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 203); check number 2067, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 219); check number 2063, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 224); check number 2074, dated 8/20/04, signed by Mr. Farris (General Steel Ex. 229); check number 2065, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 235); and check number 2064, dated 8/19/04, signed by Mr. Farris (General Steel Ex. 236).[25]

---

[25] The existence of that account is also evidenced by several unsigned checks: check number 2027, dated 7/31/04, unsigned (General Steel Ex. 194); check number 2018, dated 7/31/04, unsigned (General Steel Ex. 213).  In addition, proof of the account's existence is also evidenced by check number 3001, which is undated, unsigned, and stamped "VOID" and "USE THIS SAMPLE TO REORDER" (General Steel Ex. 265).

### (4)  AmSouth Bank

Two checks were written on account number 1003033001 at AmSouth Bank. Those were check number 3040, drawn on that account, dated 12/03/04, and signed by Mr. Farris (General Steel Ex. 65) and unsigned check number 3043, dated 12/03/04 (General Steel Ex. 62 & 269).

### (5)  Capital City Bank

Several checks were written on account number 2851955101 at Capital City Bank.  Those were check number 1019, dated 7/31/04, signed by Mr. Farris (General Steel Ex. 117); check number 1004, dated 8/03/04, signed by Mr. Farris (General Steel Ex. 193); and an order form for checks on that account, which bears the handwritten notes "order checks," "Brenda order new checks," "Order 7/20/04," and "be here in 3-5 days."

### (6)  Wachovia

Check number 20015, dated 4/20/04, and signed by Mr. Farris was written on account number 2000016281248 at Wachovia . (General Steel Ex. 270).

### b.  Conclusion to Mr. Edwards' Testimony

All-in-all, the records Mr. Edwards received were seriously deficient. The records he received in both cases did not contain any stock transfer ledgers pertaining to Houston Steel, Inc. or similar records pertaining to ownership in Houston Steel Fabricators, or any of the other related non-bankrupt entities for that matter.  They did not contain any financial statements, profit and loss statements, or balance sheets, journals or general ledgers, other than the one for Houston Steel, Inc. dated April 30, 2004.  They did not contain any records about capitalization of either of the two bankrupt entities, or the ownership and transfer of stock or interests in the two.  They did not contain any documents pertaining to the internal government of either of the entities, such as articles of incorporation, by-laws, or operating agreements.  They did not contain any records reflecting the source of either entity's physical assets, where those assets were acquired, whether the assets were paid for, how the assets were paid for, where the assets are located, and the  disposition of those assets.  They did not contain any records of bank deposits except for two bank statements with scanned enclosures which may have contained a deposit slip or two.

Except for the checks listed above, and the two bank statements, the records did not contain any records of banking activity for the combined 25 accounts that were maintained at some point in time by the two companies.  Other than the few vendor files produced, which contained invoices, bills and statements from and sometimes purchase orders to said vendors, there are no records which reflect the jobs or work

40

performed by either of those two entities. There were no records pertaining to the physical structure and land where the entities performed their work and operated their business. And, there were no records pertaining to Houston Steel Inc.'s merger with Blount.

At a minimum, adequate financial records for a company should reveal: what was bought and sold; what is owed and who it is owes; what is owned, how it was acquired, and what happened to it; what property it currently has, how it was acquired, and where it is located; what money it received, from where, and who received it; what money it paid out, who it was paid to, and what it was paid for; and what money it has left.

In contrast, all Mr. Edwards received in connection with the <u>Houston Steel, Inc.</u> bankruptcy, was a list of aged accounts payable and receivable, one general ledger for basically a month or two period, and a collection of prior tax returns. There was nothing that answered the who, what, when and where with respect to the corporation's physical assets and disposition of those assets. There were no contracts or other indicia of what work the company had performed during the two years that Mr. Farris ran it. There was nothing that answered the who, what, when, where, and how much with respect to the cash received and paid out during that period of time. There was nothing that answered the who, what, when, where, and how much with respect to payments made from and deposits to the corporation's 16 bank accounts. There was nothing that answered the who, what, when, where, and how much with respect to the corporation's employees.

This lack of records hinders or prevents a trustee in bankruptcy from ascertaining, with any degree of accuracy, the company's financial condition and business transactions. The trustee would be hampered in finding and liquidating the debtor's assets, finding and recovering fraudulent and preferential transfers, unveiling and remedying insider pilfering and self-dealing, discovering avoidable liens, evaluating and litigating claims issues.

All Mr. Edwards received in connection with the <u>Houston Steel Fabricators</u> bankruptcy was the group of random vendor files described above, including a smattering of random checks and excerpts from check registers showing checks purportedly made out to those vendors. There was nothing that answered the who, what, when and where with respect to the company's physical assets and disposition of those assets. There were no contracts or other indicia of what work the company performed during the 10 month period that Mr. Farris ran it. There was nothing that answered the who, what, when, where, and how much with respect to the cash received and paid out during that period of time, except, with respect to expenditures, what can be pieced together with a great deal of effort from the checks in the random vendor files. There was nothing that answered the who, what, when, where, and how much with respect to payments made from and deposits to the company's nine bank accounts, except, with respect to expenditures, the very little that can be pieced

41

together with a great deal of effort from the checks in the random vendor files. And there was nothing that answered the who, what, when, where, and how much with respect to the company's employees.

Again, this lack of records causes those responsible for investigating and administering a bankruptcy case from fulfilling their duties.

### c. What Records Would Be Expected?

This Court would expect that companies like Houston Steel, Inc. and Houston Steel Fabricators would have had at a minimum: employee records; contracts pertaining to the jobs they performed; and monthly bank statements for each of their combined 25 bank accounts. Without such records, companies such as Houston Steel, Inc. and Houston Steel Fabricators would be unable to measure their productivity and profitability on a regular basis, file proper tax returns, or even know how much they had in the bank from day-to-day.

Mr. Farris' description of the operations confirms this Court's expectations and confirms that from the extent of his operations, there should have been far more records produced than there were. The size of the operation and the amount of business it generated alone dictate that there should have been many more records. Mr. Farris testified:

> At probably the middle of 2004, we had more people working at Houston Steel than we did at any other time. There were approximately ninety people that worked in the factory. There was approximately a hundred people that worked in the field. We had a vice-president of the finance who helped write the procedures that were used for accounting. We had a vice-president of estimating, a vice-president of sales and a vice-president of construction. All four of those people answered to me. The accounting folks, for example, I believe they had about six people that worked in that department. Estimating had three. Sales had two, and then in construction they had probably a half a dozen, to nine, salaried superintendents that were responsible for the day-to-day field operations. Each department had an internal procedure that it followed or it was supposed to follow.

Transcript at 324.

Mr. Farris described the nature and size of the large facility where the related companies worked as six acres of land occupied by a main building sixty-five feet wide, fifty-five feet tall and nine hundred feet long. The facility also included: a separate, detached small office; a nine thousand, five hundred square foot paint shop; and a mechanic shop. It also included two, double-wide trailers that served as the main office. Transcript at 220-21.

42

In addition, according to what Mr. Edwards said was reflected on Houston Steel, Inc.'s bankruptcy petition, Houston Steel, Inc., was owed $895,000 in accounts payable and owed $1,981,548 in debt. Transcript at 101-02. Again, according to what Mr. Edwards said was reflected on its bankruptcy petition, Houston Steel Fabricators, was owed $1,100,000 in accounts payable and owed $2,471,491 in debt. Transcript at 103.

According to Mr. Farris, the companies cumulative output was about $20,000,000 in the two and one-half years prior to filing bankruptcy. Transcript at 85. And while it is difficult to piece together all of the information necessary from Mr. Farris' testimony, it is apparent that his related entities held a great deal of equipment which was worth about $750,000, albeit no one seems to know exactly where it is, due in part to the lack of adequate records.

The important point is, two companies that generated $20,000,000 in a two and one-half year span, had about 200 employees, worked out of a six acre facility, owned a combined $2,000,000 in accounts receivable, owed over $4,000,000 in combined debt, had between them 25 bank accounts, and owned three quarters of a million dollars in tools and equipment, would have come closer to filling two rooms with records than two and a half boxes. Indeed, two and a half large boxes would hardly seem sufficient to hold bank statements alone for even the relatively short time that Houston Steel Inc. and Houston Steel Fabricators were in existence.

### d. What Difference Does It Make?

Mr. Farris' testimony, which ironically is limited because of what he blames on inadequate or unavailable records, suggests an answer to the Court's question.[26] In regard to the ownership of the Byron, Georgia, facility, Mr. Farris testified:

> Q. Okay. Who owns the five overhead cranes and the real estate that you say is presently sitting in Georgia that was formerly used by Houston Steel, Inc., who owns it?

---

[26] Mr. Edwards answered this question directly by giving one example of the problems caused when records are not produced. He testified:

> Bank accounts is probably the primary source of data I use to begin the work of doing transactional analysis because, when it comes down to it, if we have an adversary of an insider transfer, fraudulent conveyance, it is going to come down to the movement of cash most likely. So not having all of these accounts really hampered my ability to perform the duties that the trustee requested I do.

Transcript at 115-16.

A.     I don't have all of the documents that lays out exactly how Irving and Richard – I forget Richard's last name – and I, actually have ownership or how my ownership is divested to Irving and what is in it and what is not. **I don't have those documents with me.  I can't answer that question**.

Q.     Well, was that real property and improvements ever titled in your name?

A.     Yes.

Q.     Was that real property and improvements disclosed in any way on your bankruptcy filings in this case, the ones you did yourself?

A.     No.

Q.     Why not?

A.     Because they were sold but I don't know what portion of them were sold and **I don't have the records here today to tell you exactly what I was able to keep and what I wasn't able to keep** in relation to what Irving bought from me because I sold it to Irving Hoss.

Q.     Who is Irving Hoss?

A.     He is an investor, a friend of mine in West Palm Beach, Florida.

Q.     An investor like Dr. Damore?

A.     No, not at all.  Irving Hoss has been investing money for fifty years in companies and people and businesses and so on and so forth.

Q.     And he invested money in Houston Steel?

A.     No, he loaned me money.

Q.     Loaned Chuck Farris money.  Did Chuck Farris then put that money in Houston Steel?

A.     Yes, sir, every penny of it.

Q.     And you gave Irving a security interest in land and improvements in Byron, Georgia, as collateral?

44

A.    **I don't have the records in front of me to say exactly what it was.  If you have them, show them to me.  I don't recall.**

Q.    I don't have them.

A.    **I don't recall.**

....

Q.    Okay.  And then did – who owned the land and building when it was occupied partially by Fabricators and partially by Erectors?

A.    Well, it had three owners at one time.  It had two owners at another time.  It had one owner at another time.  So, I mean, it depends on when you are talking about through the spectrum of time there because, when we first got there, and I wish I could remember Richard's last name, the original owner of Houston Steel.  He was the first only person.  Then I was involved.  Then I got out and Irving Hoss stepped in.  And then Irving Hoss backed out and Irving Hoss' Roth IRA, as trust, stepped in.  So there was four different owners at different times as we went through that property.

Q.    Okay.  And in the absence of records, you can't tell me who owns the property today?

A.    Well, here is what my problem is.  I don't know how Irving has treated the Roth account.  I don't know where Mr. – what the heck is his last – what is his last name?

Q.    I don't know.  I would help you if I could.

A.    I just can't remember – Richard has an original security interest that I think is worth about three hundred thousand dollars now, but I don't know that Irving hasn't bought him out over time.  Do you know what I am saying?  I don't know where Irving is with that, if he went ahead and bought that security interest out so he could have all of that land and buildings for himself.

Transcript at 262-63; 336-37 (emphasis added).

      Thus, in regards to the physical facility where Houston Steel, Inc. and Houston Steel Fabricators conducted their business, and the five overhead cranes supposedly posited on those facilities, Mr. Farris was hamstrung by his own failure to maintain or have available the records, if any, which he either failed to maintain, or which he

concealed from the trustee.  At a minimum, these records would be necessary to verify the alleged security interests purportedly held by "Irving" and "Richard."

Mr. Farris' attempt to explain the exodus of equipment from his related entities, which  ironically he again qualified because of inadequate or unavailable records, also suggests an answer to the Court's question.  Mr. Farris testified:

> A.    Oh, we had some vans full of tools that Blount Riggers & Erectors originally brought into the original merged companies, drills, some big steel plate drills, big plasma cutters, things of that nature.

> Q.    And what happened to those?

> A.    What happened to those tools?

> Q.    Yes.

> A.    They belong to Redrock Steel now.  They are Redrock's.

> Q.    So it is your testimony that it all came from Blount Riggers and Erectors, the assets all originated there?

> A.    Actually – well, thirty-seven thousand dollars of it, you can check with – the bankruptcy judge here was – golly.  The trustee's name is a French name, a real good guy.

> THE COURT: Toffel, Andre Toffel?

> THE WITNESS: Mr. Toffel, Andre Toffel.  I wrote a check for thirty-seven – almost forty thousand dollars to Mr. Toffel to buy tools and equipment from Millennium Metal Works bankruptcy through the Stafford bankruptcy.  So I bought forty thousand dollars worth of tools from this courthouse.

> Q.    Okay.  And you bought them as Chuck Farris or did you buy them as Blount Riggers and Erectors?

> A.    Chuck Farris.

> Q.    Okay.  And then those assets remained Chuck Farris assets while they were used by Blount?

> A.    I sold them to Blount.  At sometime in the future, they became Blount Tools – Blount Riggers & Erectors Tools and Supplies, which then merged into Houston Steel –

46

Q.      And became Houston Steel?

A.      Then I separated them back out, bought them back out from
        Houston Steel, put them into Erectors, bought them from Erectors,
        sold them back into Redrock Steel.

Q.      Okay.  What did Houston Steel get when you bought them out of
        Houston Steel?

A.      Let's see. The first lump of money I put in there was three hundred
        and eighteen thousand dollars I put into the company, and I believe
        – and, again, **I don't have my records here but, if I had my
        records**, I think it would show that for the first three hundred
        thousand dollars, a little more than that that I put in, I took all of the
        equipment, all of the trucks, all of everything that was not part of
        Richard – and I can't remember Richard's last name – in the
        Houston Steel original merger.  Everything that he didn't have listed
        that he did with Steve Oliver and the Honeycutts, I took all of that
        back to myself.

Q.      All right.   So the three hundred thousand was not a loan.  You
        were buying equipment for that –

A.      A portion of it was a loan.  The rest of it was to buy tools and equipment.

Q.      Okay.  So then you had it back in your name at that point?

A.      Right.

Q.      And then it was later transferred to Fabricators?

A.      Who?

Q.      Fabricators.

A.      The first time, I put some of it in Fabricators, I put some of it in
        Erectors, and I got units for it.

Q.      Okay.  And then you later bought it back from Fabricators and
        Erectors?

A.      I bought it back out from Fabricators, took it back with nine hundred
        thousand dollars, a portion of the nine hundred thousand dollars
        that I borrowed from Irving Hoss.

47

Q.    Okay.  And that equipment is still with Redrock?

A.    Yes, Redrock still has some of that equipment, yes.

Q.    In Alabama?

A.    Yes.

Transcript at 333-35 (emphasis added).

As the above also indicates, Mr. Farris claims to have bought equipment from Houston Steel, Inc. and Houston Steel Fabricators, and to have made substantial loans to his related entities, but he has not produced any records of those transactions. Clearly, the trustee needed, and had the right to obtain those records, if any, in order to investigate the genuineness of those loans and transfers and to sort out who owns what and to determine where everything is located

And finally, Mr. Farris' implausible claim that he did not cash certain checks made out to CPF Leasing which he drew on the bank accounts of Houston Steel, Inc., Houston Steel Fabricators, and Damore-Abraham, also suggests an answer to the Court's question.  He testified:

Q.    Well, the checks that were written to CPF Leasing by Houston
      Steel, Fabricators and maybe Damore Abraham, I can't remember,
      what would those checks have been – what was the consideration
      for those checks?

A.    Well, first of all, very, very few of those checks were ever cashed.
      There were several checks that were written that are listed in your
      exhibits but there is only one for four thousand dollars that I saw
      yesterday, out of the six or seven that you had the accountant
      testify to, there was only one of them that was cashed.  That would
      have been for rent that they owed me on some equipment that they
      had at the time that I was letting them have or use in the company,
      but they didn't have any money to pay me, so I let them keep using
      the equipment free.

Transcript at 337-38.

## 2.  Mr. Farris' Explanations of Why
### Records are not Available

Of course Mr. Farris does not agree with Mr. Edwards' conclusions and offered several explanations.  He contends either that the records were destroyed, but if they were not, he produced them to someone other than Mr. Edwards, or that he still has copies of them but was never really asked to produce those copies.

48

## a. The Records Were Destroyed by a Hurricane

Mr. Farris' primary explanation of why most of his companies' records are not available is that they were destroyed by flood water during a torrential downpour and windstorm caused by the remnants of a hurricane in the fall of 2004.  He testified:

Q.      All right.   Now this records storage area, it experienced some severe problems from the hurricane that came through, did it not?

A.      In 2000 – and I believe it is 2004, and I will stand corrected, but I believe it was in the fall of 2004, there were two hurricanes that came almost back to back up through Florida that Macon, Georgia, got the tail-end of those two hurricanes.  The first one created a flood in the city of Byron that did not affect our plant too badly.  We had water on the floor of the main factory.  We were able to get our equipment up and get it out of the water before the actual damage occurred.

The second hurricane blew the top off of the factory for about sixty feet back on the north – on the southwest corner of the building.  Directly below where the roof fell in was our break room that we had built.  The break room cost us about thirty thousand dollars to construct.  When the roof fell in, it fell on top of the break room.  Water poured into our main switch gear, the main bus duct, all of the main lighting panels that was on that wall and caved in the break room.  There are photographs; there is film taken by BB&T Insurance.  The agent's name was Jim Lynch, I believe was his name.  There are photographs.  And they paid us approximately forty thousand dollar claim to repair the break room, to repair the roof, to have Georgia Power come out and do work on the main switch that came into the factory, so on and so forth.

Now all of the records that were sitting on top of the break room, probably a hundred boxes, wound up in the floor of the break room with about a ton of steel on top of them, sheetrock, lights, wires, everything you can imagine.  There are photographs of all of this.

That same story I just told you was told to the accountant that came to visit me one time who stayed in my office thirty minutes asking me questions about Houston Steel and their record-keeping.  He said he was the trustee's accountant and that he would be back, but he stayed no more than thirty

49

minutes.  He talked to me and he talked to Jennifer Bowden and Grace O'Neal, and **we told him all we could tell him about the records that were there, that we couldn't provide him with any of that, that that stuff had been destroyed**.

I didn't cause it to rain.  I didn't make the roof fall.  I didn't destroy, direct to be destroyed or anything any records.  We put them in the garbage can because they were a  mingled-up mush of water, steel and sheetrock.

Transcript at 222-24 (emphasis added).

Even if the Court were to accept Mr. Farris' explanation at face value without question, Mr. Farris' own testimony, coupled with that of others, completely disproves Mr. Farris' claim that after the hurricane, he did not have any records to give Mr. Edwards.

As explained above, Mr. Edwards testified that Mr. Farris kept records on a computer at the companies' offices.  When he met Mr. Farris at that office, Mr. Farris directed him to certain records which Mr. Edwards printed and brought to court for the trial of these matters.  The evidence shows however that apparently Mr. Farris had far more records on that computer, or maybe another computer, than he was willing to divulge to Mr. Edwards.

Mrs. Dayle Brown, who worked for Mr. Farris from November 2001 through April 2002 testified in her deposition that he was using the program "Quickbooks" to maintain the records at that time.  Anderson Ex. 29 at 14, Deposition of Dayle Brown.  Mr. Farris later changed to another software program called "Job Power," but his own testimony agrees with Mrs. Brown and confirms that there were computer records available that he did not give to Mr. Edwards. He testified:

Q.      Okay.  Now briefly discuss your check issuance procedure from the time when an invoice arrived and who it would go to and what the steps would be.

A.      Well, our procedure is called – for everything that we bought, we should have had a purchase order.  I noticed in some of the documents that – we had one software system.  It was a system called Job Power.  Job Power has the ability to have, I think, a half a dozen or so entities being run with one package of software.  So we could set up six, seven companies, run all their general ledger accounts, run their payroll, run their purchasing departments and everything out of one software set up with seven identities.  As I recall, it was six or seven identities.

50

Transcript at 325-26.

So, what happened to those records?  Were they also destroyed by the hurricane.  Mr. Farris says no.   He testified:

> Q.     All right.   When the hurricane caused the roof to cave in on your building, it is your testimony that all of the corporate records that were in that store room were destroyed?
>
> A.     Everything that was in the store room was destroyed.
>
> Q.     But that wouldn't have affected computer records; would it?
>
> A.     Hard files, yes.  **Hard drive, no.**

Transcript at 264.

Because these records were on his computer, it should not have mattered what records were destroyed by the storm.  He could have printed them and produced them for Mr. Edwards.  But, both Mr. Edwards and Mr. Farris acknowledged that Mr. Farris produced only the "six or seven inches" of records when the two met at the companies' offices.

### b.  Mr. Farris Produced 40 Boxes of Records
### (that presumably were not destroyed in the hurricane)
### the Day after Mr. Edwards Left

Mr. Farris' backup explanation of what happened to his companies' records is that after meeting with Mr. Edwards, he had at least forty boxes of records that presumably survived the hurricane (and which he did not offer to or tell Mr. Edwards about when Mr. Edwards was at the office) delivered to the Chapter 7 trustee's office.  Mr. Farris explained:

> Q.     Well, here is my question: What about computer records available from your hard drive when Chris Edwards, the official accountant for the Chapter 7 Trustee, came by, why were you not able to punch a button and print things out of your computer?
>
> A.     I actually heard him say yesterday that he sat beside me, in front of my computer terminal, and hit a button and printed out everything he wanted.  He said that yesterday.   He hit a button on my computer and he printed out everything I had on my terminal, is what he said in this room yesterday.

51

Q.    Okay. But you also heard him say the only accounting, computer type record he found among your records, including things printed out, was one general ledger through April of 2004?

A.    He got a journal. He got a complete journal of activity from January 1 of 2004 to April of 2004, and he got all of 2003 that was on the journal, on the ledger that was in our computer. Everything he wanted that I had, I gave him. He printed it himself.

Q.    So Mr. Edwards printed out computer information from your computer that he did not bring into court with him is your testimony?

A.    Based on his testimony, he said I sat beside Mr. Farris, he and I looked at his screen, and I printed out what he had. He got what I had. I **gave him everything I had. I didn't withhold one piece of information off of that computer. I showed him exactly how to get into the server. I showed him everything he needed, and this is what I have got, it is yours, along with about <u>forty boxes</u> of stuff that we carried to the trustee's office.**

Q.    Forty boxes?

A.    **Forty boxes** that I put in my truck and sent my son to the trustee's office, along with two other fellows. There were at least forty boxes, not long boxes, the short stuff, of records and file folders and things that we gave that man. The next day we carried that down to him, and I thought Rob said that the accountant contacted him to get the rest of the stuff, but he says that he got something from Rob. I never heard what.

Q.    So according to your testimony and recollection, there was no absence of business records. Notwithstanding the hurricane, you were able to produce about forty boxes of business records and deliver them to the Chapter 7 Trustee?

A.    I am going to say it one more time, Mr. Lovein, and I am not going to let you trap me in your words. I am going to say it again. **I gave him what I had. I gave him everything that I had. I withheld nothing from him, and I explained in detail the storm damage that we had in the building. The next day we carried down to the trustee's office somewhere between thirty and forty boxes, small file folder size boxes, of vendor files, checks. Everything that we had available in the building that the trustee asked for, we gave it to him.**

52

Transcript at 265-67.

    As quoted above, Mr. Edwards testified about the documents he took with him when he left Mr. Farris' office.   He said:

> What I received was **a collection of prior tax returns, one general ledger, transaction history dated April 30, 2004, which is over a year prior to my visit, one aged payables listing of Houston Steel and one aged receivable listing of Houston Steel**.  That is essentially all that I was able to receive because **I was told that was all that was available to be provided**.

Transcript at 98.  He added:

> **The sum total of the data that I took out probably wouldn't be a stack more than six or seven inches tall.  I was expecting to bring boxes back**.

Transcript at 97.

    Mr. Edwards testified later that he received some additional records, a few boxes, after he was appointed in the Fabricators' bankruptcy case.  Transcript at 96-99.  Mr. Edwards brought the records he had to the trial of these matters.

    Again Mr. Farris disagrees.  As quoted above, he delivered, or had delivered 40 boxes of records to the Chapter 7 trustee of the Houston Steel bankruptcy case.

    Mr. Farris and Mr. Edwards are in complete disagreement over what records were produced.  Was it the few records Mr. Edwards received after the two met plus the few boxes he received in the Fabricators' case <u>or</u> was it 40 boxes?  If it were 40 boxes, where were those boxes stored that they were not destroyed in the hurricane with Mr. Farris' other records?

    The Court believes Mr. Edwards, who has no reason to lie.  His credibility has not been impeached.  Mr. Farris has ample reason to lie.  His credibility has been impeached.

### c.  Mr. Farris Gave the Records to the Companies' Bankruptcy Attorney, Mr. Rob Frick

    Mr. Farris' second backup explanation (and third explanation) of what happened to his companies' documents, that is if the records were not destroyed in the hurricane and were not part of the 40 boxes delivered to the Chapter 7 trustee, is that he gave

them to Mr. Rob Frick, the bankruptcy attorney who represented the two Houston companies in their bankruptcy cases. He explained that Mr. Frick in turn delivered them to the trustees in those bankruptcy cases. Mr. Farris testified:

A. I want to clear up a couple of things that guy said yesterday. First of all, he talked about records that he didn't have, okay. We hired a bankruptcy attorney by the name of Rob Fricks to represent two entities, Damore Abraham and Houston Steel Fabricators and Houston Steel Erectors. The two entities of the holding company and Houston Steel, Inc. When we hired Rob, Rob asked us to bring him all of the corporate records. He gave us a list, I need all these things. In order to prepare this petition, I need all of these things.

I had in my files copies for me that I kept of every internal transaction of every meeting of everything that we did that I gave Rob. When that gentleman came to my office and asked me for records, I told him two things. I told him about the damage and I told him about Mr. Fricks, that Rob had certain documents that he would need. Now I thought I heard him say yesterday that Rob gave him documents.

**Well, somewhere along the line he got his hands on an enormous amount of documents** but he is missing documents that are exactly related to the stuff that is presented here. So I don't know the context on how these were prepared because there are things that would go hand-in-hand with what he has there.

For example, there is in one of these exhibit books from the State of Georgia where the LLCs for Damore Abraham, Houston Steel Fabricators and Houston Steel Erectors, I suppose they are registrations because it is not like a corporation. An LLC is not set up the same as a corporation. I saw the operating agreement in one of these exhibits. Attached to those operating agreements were minutes of meetings that were held between me and David Pope, between me and Irving Hoss, between me and Eddie Damore, between me and Rita Damore, between me and our accounting department, between me and our insurance company. There is a host of records that should be in the exact same file that that document came from with every kind of minute of meeting that we had. We called them minutes of meetings. They are not minutes of meetings, per se, as you would have when one of the lawyers asked

54

yesterday where was the minute – the corporate book. Well, there is no corporate book of stock and a stock register in an LLC like there is in a C-corporation. It is much more loose than that because it is sort of a quasi-partnership as the lawyers explained it to me, and it made sense for us to do it.

But all of those records that should be associated to some of these exhibits are missing from the exhibit file. I don't know where they are. I have them. I have several boxes of records that belong to me, that are my copies that are stamped "copy" on the records that I have that are mine that I have had this whole time, but they are the same records that were given to Rob Fricks for Rob to hand out and do whatever it was he did.

Q.  So Rob at any time either did hand over the documents or made them available to the trustee's accountant?

A.  I assume. I don't know. All I know is that I got asked to speak at some – at a four numbered meeting I went to, a 2242 or 2555 or some kind of meeting I went to, bankruptcy meeting.

Q.  Probably a 2004 examination.

A.  2004. I went to a 2004 meeting and Rob Fricks sat on the front row and I met that gentleman there for the first time, and I was asked about these records. And I believe the record of that testimony will say that I gave Rob and Rob had certain records, and I believe Rob said at the time I have records and I will give them to you or I will hand this over to you, whatever the case may be.

....

Q.  And to recap the discrepancies between purchase orders, invoices and checks, basically that was an internal loan that was made from your series of companies which was to be accounted for at the end of the year and adjustments to be made?

A.  Yes but at the end I won't dispute the fact we got – it was sloppy. I won't dispute the fact that we probably didn't do a very good job as Houston Steel, Inc. was going down, steel prices were fluctuating, we were losing money hand over fist. We probably could have done a better job on the surface of keeping a more consistent approach to how we were accounting. But the underlying issues of the record that said this transaction was made for this purpose this

55

day, this transaction was made this day, all of those journal entry records, which an accountant keeps on a green columnar pad and the associated information, all of that information existed then, it exists now. I don't know why it is not in those exhibits because it is my contention that Rob had that stuff, it was given to him to prepare the petitions that he made. He handed stuff over in the courtroom or in that 2400 meeting. All of that was done.

....

I hired a lawyer who was represented to me to be a bankruptcy counsel. I gave him all of the records that we had, closed, open, so on and so forth. Rob had everything.

Transcript at 230-32, 250-51, and 272.

Mr. Farris did not elaborate. Hence, the Court is unable to determine whether the "enormous amount of documents" that he allegedly gave to Mr. Fricks pertained to Houston Steel, Inc. or Houston Steel Fabricator, or both; whether they were delivered to the trustee in the Houston Steel, Inc. case or to the trustee in the Houston Steel Fabricator case; whether they included copies of the records supposedly destroyed in the hurricane; whether they included the forty boxes of records that Mr. Farris alleges to have delivered to the trustee in the Houston Steel, Inc. case; whether the "enormous amount of documents" were in addition to the forty boxes; or whether he was simply contradicting himself again and implicitly withdrawing his claims that the records were destroyed by the hurricane or delivered in 40 boxes of records.

Moreover, whichever company's case involved his alleged delivery of documents to Mr. Frick and the latter's alleged delivery of documents to the trustee, Mr. Farris' testimony is directly contradicted by the testimony given by Mr. Edwards. Mr. Edwards testified that he received only a six or seven inch stack of records in connection with the Houston Steel, Inc. case and two and a half boxes of records in connection with the Houston Steel Fabricator case. He was the court-appointed accountant for each trustee in the two bankruptcy cases. Neither of those quantities can under any circumstances be considered "enormous."

### d. Mr. Farris has Copies of Records Stored at His Sister's House

Mr. Farris' third backup explanation (and fourth overall) is that regardless of any other explanation of what might have happened to the records, he has copies of the business records of his entities stored at his sister's house in Clanton, Alabama. Transcript at 267. This explanation raises several questions. Did Mr. Farris conceal these records from the trustee? Are they copies of the records he contends were destroyed in the hurricane? If they were, why did he not tell Mr. Edwards the complete

56

story, that is, the records were destroyed in a hurricane, but he had copies stored at his sister's house? Are these records in addition to any others mentioned?

As one of the quotes above implies, these may be copies of records that Mr,. Farris contends he gave to "Rob." He testified, "I had in my files copies for me that I kept of every internal transaction of every meeting of everything that we did that I gave Rob." Transcript at 230. But even if they were, what are the connections of these records to those that were destroyed, or those in the 40 boxes?

### 3. Conclusion to Record Production

Mr. Farris was required by bankruptcy law to produce his records. He did not. The Court does not believe Mr. Farris' explanations. First of all, he is not credible. Second, his explanations are contradicted by each other. Third, those explanations are contradicted by the testimony given by Mr. Edwards, who is a credible witness, and whose testimony otherwise stands uncontradicted.

Based on the evidence, the Court must conclude that Mr. Farris concealed the majority of his computer records from Mr. Edwards. In addition, the Court concludes that Mr. Farris' statement that he could not provide adequate records pertaining to the operation of Houston Steel, Inc. to Mr. Edwards because those records had been destroyed in the storm was false.

### C. Mr. Farris Failed
### to List Personal Bank Accounts on His Petition

Question No. 2 of <u>Schedule B - Personal Property</u> of the bankruptcy schedules Mr. Farris filed with his petition required him to list all of his, "Checking, savings, or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses or cooperative."[27] In response to that question, Mr. Farris placed an "x" in the column labeled "None," that is, he did not have any <u>active</u> bank accounts when he filed his bankruptcy petition on October 25, 2005. <u>Schedule B - Personal Property</u>, filed October 25, 2005, Case No. 05-13253, Proceeding No. 1.

Question 11 of the <u>Statement of Financial Affairs</u> Mr. Farris filed with his bankruptcy petition required him to:

> List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were <u>closed</u>, sold, or otherwise transferred within one year immediately preceding the commencement of the case. Include checking, savings, or other financial accounts,

---

[27] Question 2 relates to active accounts.

certificates of deposit, or other instruments, shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses, and other financial institutions.

Statement of Financial Affairs, filed October 25, 2005, Case No. 05-13253, Proceeding No. 1.[28]

In response to that question, he placed an "x" in the column label "None," that is, he did not have any bank accounts which had been held in his name or for his benefit which had been <u>closed</u>, sold, or otherwise transferred within one year immediately preceding the commencement of his case. Id.[29]

As explained above, Mr. Edwards testified that the records turned over to him in connection with the Houston Steel Fabricators case included numerous checks written by Mr. Farris and his employee, Jennifer Bowden, on <u>personal</u> bank accounts held by Mr. Farris. Three are discussed below.

## 1. Colonial Bank in Macon Georgia

The records Mr. Edwards reviewed include copies of 11 checks written on various occasions from account number 8041815278 at Colonial Bank in Macon Georgia. General Steel Exs. 53, 58, 65, 87, 99, 165, 192, 202, 207, 222, 226 & 278. The name of the account, which is printed on the check, is "Charles Farris DBA Houston Steel." Mr. Farris' home address is printed on the check under that account name. All of the checks were signed by Ms. Bowden. The checks were written on December 20, 2004; December 22, 2004; December 23, 2004(2); December 27, 2004; January 4, 2005(2); January 5, 2005(2); January 6, 2005; and January 12, 2005.

The Colonial Bank checks constitute evidence that Mr. Farris had a personal account in his name at that bank when the checks were written. Mr. Farris admitted to the existence of the account and did not deny that it was open on the dates shown on the checks. Those dates were within the Question 2, one-year period preceding his bankruptcy filing.

Based on the evidence, the Court must conclude that because this account was open on the dates shown on those checks, it had to have been either open when Mr. Farris filed his bankruptcy case ten months later or closed at some point during those

---

[28] Question 11 relates to closed accounts.

[29] In discussing whether Mr. Edwards asked him about closed accounts, Mr. Farris testified that he could not recall, but that if Mr. Edwards had asked him, "I would have told him that anything we had in our possession prior to the storm would have been destroyed and was put in the dumpster, which is what I did tell him." Transcript at 272.

58

ten months.  Thus, Mr. Farris was duty bound to either report the account in response to Category 2 on his <u>Schedule of Personal Property</u> as an active account or report it in response to Question 11 on his <u>Statement of Financial Affairs</u> as a closed account.  He did neither.

## 2.  CB&T Bank of Middle Georgia

The same records Mr. Edwards reviewed also included copies of 14 checks written by Mr. Farris and Ms. Bowden on various occasions from account No. 4558301 at CB&T Bank of Middle Georgia.  General Steel Ex. 101, 185 & General Steel Ex. 280.  The name of the account, which is printed on each of the checks, is "CPF Leasing."  Mr. Farris' home address is printed on the checks under the account name.  The checks were written on September 18, 2004; October 14, 2004; October 22, 2004; October 23, 2004; October 25, 2004; October 29, 2004; November 2, 2004; November 3, 2004 (two); November 6, 2004 (four); and November 24, 2004.  Ms. Bowden signed four of the checks.  Mr. Farris signed the rest.

Mr. Farris acknowledged that "CPF Leasing" was just a name under which he conducted business.  It was not a legal entity.  It did not have any existence apart from him.  He testified:

> Q.    CPF Leasing, was it just a proprietorship, Chuck Farris dba?
>
> A.    Yes.
>
> Q.    So CPF Leasing was, in effect – you understand the corporate veil and corporate entities and LLCs and LLPs, you understand those concepts?
>
> A.    Oh, I do.
>
> Q.    Okay.  So when a check was made payable to CPF Leasing, it was the functional equivalent of a check to Chuck Farris?
>
> A.    When a check was made payable to me?
>
> Q.    To CPF Leasing.
>
> A.    That's right.

Transcript at 332.

Hence, the bank account at CB&T belonged to Mr. Farris.  Eight of the checks in evidence were written on that account during the year preceding his bankruptcy filing.  They were written on October 29, 2004; November 2, 2004; November 3, 2004;

November 3, 2004; November 6, 2004; November 6, 2004; November 6, 2004; and November 6, 2004.  He signed six of them.  Ms. Bowden, who apparently had signature rights on the account, signed the other two.  Half of the eight bear bank markings which confirm that they were negotiated.  The other half do not.  Either way, those eight checks prove conclusively that Mr. Farris had a personal bank account at CB&T on the dates that those checks were written.[30]

Based on this evidence, the Court must conclude that because this account was open on October 29, 2004; November 2, 2004; November 3, 2004; and November 6, 2004 when some of the checks were written, it had to have been open either when Mr. Farris filed his bankruptcy case almost 12 months later or closed at some point during the 12 months preceding.  Thus, Mr. Farris was duty bound to report the account in response to Question 2 on his Schedule of Personal Property as an active account or to report it in response to Question 11 on his Statement of Financial Affairs as a closed account.  He did neither.

### 3.  Rivoli Bank in Macon, Georgia

The same records also included a copy of a check for $3,244.07 written on August 24, 2004, by Mr. Farris on an account at Rivoli Bank in Macon, Georgia.  General Steel Ex. 279.  The name of the account, which is printed on the check, is "CPF Leasing," which, as indicated before, is not a distinct legal entity, but rather a pseudonym under which Mr. Farris was doing business.  Mr. Farris' home address is printed on the check under that account name.

In contrast to the above, there is no evidence that the Rivoli Bank in Macon, Georgia, account was either open when Mr. Farris filed bankruptcy or that it was closed within the year preceding his bankruptcy filing.

### 4.  Conclusion to Unlisted Bank Accounts

Mr. Farris failed to list the active bank accounts he had within the year before he filed his personal bankruptcy.  He also failed to list the closed bank accounts he had within that year.  Under bankruptcy law, he was required to list those accounts on either the Schedule B - Personal Property or Statement of Financial Affairs he filed in this case.[31]

---

[30] Mr. Farris was not specifically asked about that account, or those checks, and offered no explanations about them.

[31] See Note 18.

# VI.  Additional Conclusions of Law
## with Additional Findings of Fact

## A.  Mr. Farris' Discharge Must be Denied under Section 727(a)(4)(A)
### for Making a False Oath on His Personal Bankruptcy Petition

### 1.  Applicable Law

Section 727(a)(4)(A) of the Bankruptcy Code provides, "The court shall grant the debtor a discharge, <u>unless</u> ... the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account...."  11 U.S.C. § 727(a)(4)(A) (emphasis added).

To prevail on an objection to discharge under section 727(a)(4)(A), a plaintiff must prove by a preponderance of the evidence that, "(1) the debtor made a false statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent;  and (5) the statement was material to the bankruptcy case."  <u>Sholdra v. Chilmark Financial, LLP (In re Sholdra)</u>, 249 F.3d 380, 382 (5th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1042 (2001).  <u>Accord</u>, <u>Keeney v. Smith (In re Keeney)</u>, 227 F.3d 679, 685 (6th Cir. 2000).

This standard is refined by the per curiam opinion of the Court of Appeals for the Eleventh Circuit in <u>Chalik v. Moorefield (In re Chalik)</u>, 748 F.2d 616 (11th Cir. 1984).  That opinion includes, "This circuit has also said that a discharge pursuant to 11 U.S.C. § 727(a)(4)(A) should not be granted where the debtor knowingly and fraudulently made a false oath or account in connection with the bankruptcy proceeding.  In re Raiford, 695 F.2d 521, 522 (11th Cir.1983). Deliberate omissions by the debtor may also result in the denial of a discharge. <u>Id</u>." <u>Id</u>. at 618.  The opinion also includes, "A knowing and fraudulent omission from a sworn Statement of Affairs or schedule may constitute a false oath..." upon which a debtor's discharge may be denied pursuant to section 727(a)(4)(A). <u>Id</u>. at 618 n.3.

Of course, before an oath can be found to be false, it must be an "oath."  Rule 1008 of the Federal Rules of Bankruptcy Procedure requires, "All petitions, lists, schedules, statements and amendments..." to either "be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."  Fed. R. Bankr. P. 1008.  The unsworn declaration provided for in 28 U.S.C. § 1746 must be signed and dated by the person making the declaration and substantially conform to the following language:  "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct."  28 U.S.C. § 1746.

At the end of Mr. Farris' <u>Statement of Financial Affairs</u>, directly below Question 18, is a paragraph styled "Declaration Under Penalty of Perjury by Individual Debtor."  That declaration provides, "I declare under penalty of perjury that I have read the

61

answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct." Underneath that sentence, there is a line provided for the debtor submitting the statement of financial affairs to place his or her signature. Mr. Farris' signature appears on that line, thus signifying and verifying that he read the answers contained in the statement of financial affairs and that those answers, including the answers provided by him to Questions 11 and 18 of his <u>Statement of Financial Affairs</u> are true and correct.[32]

In addition, at the end of the schedules filed by Mr. Farris with his bankruptcy petition is a page entitled, "Declaration Concerning Debtor's Schedules - Declaration Under Penalty of Perjury by Individual Debtor." Under that title appears the following declaration:

> I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 13 sheets *[total shown on summary page plus 1]* and that they are true and correct to the best of my knowledge, information and belief.

Underneath that sentence, there is a line provided for the debtor who is submitting the schedules to place his or her signature. Mr. Farris' signature appears on that line, thus signifying and verifying that he read the information contained in the schedules and that this information, including the information provided by him in his response to Question No. 2 of his <u>Schedule B - Personal Property</u> is true and correct.

An unsworn declaration made under penalty of perjury pursuant to 28 U.S.C. § 1746 is the equivalent of a sworn verification for purposes of section 727(a)(4)(A). <u>Beaubouef v. Beaubouef (In re Beaubouef)</u>, 966 F.2d 174, 178 n. 2 (5th Cir. 1992); <u>Smith v. Grondin (In re Grondin)</u>, 232 B.R. 274, 276 (1st Cir. BAP 1999). Section 1746 reads:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit in writing of the person making the same ... such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury....

28 U.S.C. § 1746.

---

[32] See Note 18.

In this case, Mr. Farris' relationship to his business entities is very important in regard to the oath he took when he filed the pending case. The per curiam opinion in <u>Chalik</u> includes, "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." 748 F.2d at 618.

## 2. Mr. Farris' Oath on His Bankruptcy Petition Was False

Mr. Farris' answer to Question 18 of his <u>Statement of Affairs</u> was false. His testimony and other evidence, as recited above, conclusively proves that during the six years before October 25, 2005, the date he filed the pending Chapter 7 case, he owned, in whole or part, and personally managed and operated at least eight businesses including Millennium Metal Works, Inc.; Blount Riggers and Erectors, Inc.; Houston Steel, Inc.; Houston Steel Fabricators, LLC; Houston Steel Erectors, LLC; Damore-Abraham Holdings, LLC; Red Rock Steel Erectors and Fabricators, LLC; and CPF Leasing. In fact, Mr. Farris' sole occupation during those years was, according to his testimony, the operation of those business enterprises. Nevertheless, his response to Question 18 of his <u>Statement of Financial Affairs</u> which asked him to identify any such business was "**None**".

The Court also finds that either Mr. Farris' answer to Question 11 of his <u>Statement of Financial Affairs</u> **or** his answer to Question No. 2 of his <u>Schedule B - Personal Property</u> was false. The check records Mr. Farris turned over to the trustee in the Houston Steel Fabricators, LLC, bankruptcy case prove conclusively that Mr. Farris had open personal bank accounts at Colonial Bank of Macon, Georgia and CB&T Bank of Middle Georgia during the year before he filed his bankruptcy case. Thus, those accounts were either open when the case was filed or closed sometime during that year. If the former, Mr. Farris was required to have divulged them in response to Question No. 2 of his <u>Schedule B of Personal Property</u>. If the latter, he was required to have divulged them in response to Question 11 of his <u>Statement of Affairs</u>. He did neither.

Based on the above, the Court concludes that the subject matter of the answers and information provided by Mr. Farris in his petition in response to Questions 11 and 18 of his <u>Statement of Financial Affairs</u> and Question No. 2 of his <u>Schedule B - Personal Property</u> pertain directly to his business transactions, business dealings, and the existence and disposition of his property. Therefore, those answers are "material," according to the Eleventh Circuit's definition of that term, and, since false, are sufficient to bar Mr. Farris' discharge.

Of course, Mr. Farris would not agree with these conclusions. While he was not asked specifically about his responses to Questions 11 and 18 of his <u>Statement of Financial Affairs</u> and Question 2 of his <u>Schedule of Personal Property</u>, he offered a general, unspecific, implausible apology for the overall inaccuracy of his petition. In

63

summary, that explanation was that he and his wife prepared the petition pro se in handwriting, and asserted that his attorney was supposed to have "withdrawn" the original petition and replaced it with a new, "corrected" one. He testified:

Q.     And I direct your attention to his Schedule "B," which is a list of personal property, and item number twenty-seven under Schedule "B" is a list of machinery, fixtures, equipment and supplies?

A.     That's right.

Q.     And there is nothing listed?

A.     You asked me this question nine months ago and my answer to you then is the same as it is now. This petition has been withdrawn according to my attorney who spent time with my wife and I drafting a new petition that he has not yet filed. The information that's in this petition was brought to our attention we filled it out incorrectly. We did not list things properly. The court, in fact, I don't know if it was this court or another bankruptcy court said we had, for example, listed our house wrong. This petition is supposedly withdrawn. It is not correct in some areas. We made some mistakes. We filled it out ourselves. But the corrected petition, my attorney was supposed to refile. Whether he has or not, I don't know. I mentioned it to him this morning and he said that he had not. But this petition was supposedly withdrawn.

Q.     This petition was amended; was it not, and it was amended on November 21?

A.     I don't recall that it was amended. It may have been. I don't know.

Q.     Well, I will let you look at admitted Ex. No. 10.

A.     Okay. (Pause) This amendment, as I recall, had to do with the way we listed the house insofar as personal property was concerned, and it was still incorrect based upon the way we filled it out and that is why we stopped in mid course and hired an attorney instead of doing it ourselves.

....

Q.     Did you testify that the petition filed in this case, your personal voluntary petition, you prepared your own with no assistance of counsel?

A.    I prepared it myself.

Q.    And is this handwriting your handwriting?

A.    My handwriting and my wife's handwriting – ex-wife's handwriting.

Q.    Do you show, creditors holding secured claims, General Steel?

A.    No.  Yes, I do. I am sorry.  Yeah, General Steel.

Q.    And how much have you listed them for?

A.    Two thirty-two, one eighty-two eighty-five.

Q.    Did you say this was supposed to be – this petition has been amended once and it was supposed to be amended again to reflect something that you talked about in your direct exam testimony?

A.    For example, that issue you just mentioned about a secured claim, I am told that what we put down as secured claims are not actually secured claims, that we made a mistake in the definition of a secured claim.  I am told that we made a mistake in our definition of how our house was listed as property for offset purposes.  I am told that we didn't follow correct procedure in how you list certain types of debt.  So, yes, we made some mistakes that our attorney had advised us when we hired him, look, you can't do this, that's not what that means, it means this.  So we have a new petition that I thought had been filed.

Q.    And the attorney you are referring to is Mr. Gish, sitting here in the courtroom?

A.    Yes, Mr. Gish had given us advice that we prepared some parts of that petition wrong and that we didn't – that what we understood it to mean and what it actually does mean, as far as the law is concerned, is two different things.

Transcript at 65-66 and 276-77.

    Mr. Farris testimony suggests that any inaccuracies that appear in his entire petition were merely mistakes, which occurred because of his inexperience and lack of

65

expertise in filling out bankruptcy petitions.[33]  This Court rejects that suggestion without qualification.

First, Mr. Farris did not testify that he made any mistakes with respect to his answers to Questions 11, 18, and 2, or that his answers to any of those questions are "wrong," or that he unintentionally misinterpreted any of those questions, or that his answers to them are the result of any such misinterpretation.  And the Court cannot presume from Mr. Farris' blanket excuse that his answers to those specific questions were the result of his unintentional misinterpretation of them, or that they do not represent his intentional effort to mislead and confound the trustee and his creditors based on a correct and accurate interpretation of those questions.

Second, Questions 11, 18, and 2 are written in plain, rudimentary English.  They are self-explanatory and altogether unambiguous.  Certainly someone of Mr. Farris' business experience and acumen would understand them and could respond to them accurately and honestly.  None of the questions requires any legal expertise,

_____

[33] Mr. Farris' testimony also includes the following excerpts:

I want to clear up a couple of things that guy said yesterday.  First of all, he talked about records that he didn't have, okay.  We hired a bankruptcy attorney by the name of Rob Fricks to represent two entities, Damore Abraham and Houston Steel Fabricators and Houston Steel Erectors.  The two entities of the holding company and Houston Steel, Inc.  When we hired Rob, Rob asked us to bring him all of the corporate records.  He gave us a list, I need all these things.  In order to prepare this petition, I need all of these things.

Transcript at 230.

I bought the company out of bankruptcy. I put it back into bankruptcy.  We couldn't make anything happen with it.  We tried, but you just couldn't make any money with Houston Steel.  It just wasn't a money – the three guys that bought it from the original owner, they kept it for two and a half years.  They lost everything they had.  They couldn't make any money with it.  I tried.  I didn't make any money with it.

Transcript at 241.

It involved about fourteen subcontractors that worked on seven different projects for Temple Construction Company, a company that I bought out of bankruptcy in Greenville, South Carolina.  I put them back into bankruptcy.

Transcript at 259.

**Does this sound like someone who could not accurately complete his own Chapter 7 bankruptcy petition?**

66

knowledge, or training to answer. All are easily answerable accurately by even an uneducated person if that person is desirous of making an effort to divulge an honest financial picture.

Third, by virtue of his multiple felony convictions for crimes involving dishonesty and deceit, Mr. Farris' credibility is poor. Thus, the Court does not believe him.

Fourth, Mr. Farris' claim that his handwritten petition would be withdrawn or amended, or was supposed to have been withdrawn or amended by his attorney, is at best untimely. His original petition has been pending for almost three years. Had he wished to amend it during that period he could have done so. The fact that his suggestion came at trial belies its genuineness. Indeed, his bankruptcy attorney, Mr. Gish, did not offer to support that assertion, even though he was present and heard it like everyone else in the courtroom.[34]

Fifth, Mr. Farris did not say that if the amendment were filed, the answers to Questions 11, 18, and 2 would be different. Therefore, the Court cannot conclude that his answers to those questions would have been any different if he had filed the promised amendment to his petition.

### 3. Legal Conclusions

Once the plaintiff in a section 727(a)(4)(A) action proves that the debtor made a false oath in or in connection with his bankruptcy case, (regarding a matter that is material to that case or to administration of the bankruptcy estate), a prima facie case is made out for denial of the debtor's discharge. The burden then shifts to the debtor to prove that his misrepresentation or material omission was not knowingly or fraudulently made. Absence such proof, fraudulent intent may be inferred and denial of the debtor's discharge is warranted. The court in Carlucci & Legum (In re Murray), 249 B.R. 223 (E.D.N.Y. 2000) explains, "Where it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an intentional misrepresentation. If the debtor fails to provide such evidence or a credible explanation for his failure to do so, a court may infer fraudulent intent." Id. at 228 (quoting Painewebber Inc. v. Gollomp (In re Gollomp), 198 B.R. 433, 437

---

[34] Furthermore, Mr. Farris did in fact amend his petition once, on November 21, 2005. In that amendment, however, he did not change his answers to Question 11 of his Statement of Affairs, or Question 18 of his Statement of Affairs, or Question 2 of his Schedule of Personal Property. And its stands to reason that, if he had considered his original answers to those questions to have been wrong or mistaken, he would have changed them when he amended his petition.

(S.D.N.Y.1996)(quoting <u>MacLeod v. Arcuri (In re Arcuri)</u>, 116 B.R. 873, 884 (Bankr. S.D.N.Y.1990)(internal quotation marks omitted))).  Many cases agree.[35]

---

[35] "[B]ecause a court may infer knowledge and fraudulent intent from the existence of a sworn false statement, once a sworn statement is shown to be false, the burden to prove that the statement or omission was an honest mistake shifts to the debtor." <u>Poolquip-McNeme, Inc. v. Hubbard (In re Hubbard)</u>, 96 B.R. 739, 742 (Bankr. W.D. Tex. 1989).  "Specifically, a creditor establishes a prima facie case under this section by demonstrating that there were items not disclosed in a debtor's bankruptcy schedules.  Once the creditor establishes this, the burden shifts to the debtor to demonstrate that the omissions were not made knowingly and fraudulently." <u>Royer v. Smith (In re Smith)</u>, 278 B.R. 253, 259 (Bankr. M.D. Ga. 2001)(internal citation omitted).  "Once the objecting creditor meets its burden of proof and has produced persuasive evidence of a false statement, the burden of production shifts to the debtor to come forward with some credible explanation for a false statement on the schedules." <u>Casa Investment Co. v. Brenes (In re Brenes)</u>, 261 B.R. 322, 334 (Bankr. D. Conn. 2001).  "'[O]nce it reasonably appears that the oath is false, the burden upon the bankrupt to come forward with evidence that he [or she] has not committed the offense charged.'" <u>Burrell v. Sears (In re Sears)</u>, 225 B.R. 270, 274 (Bankr. D.R.I. 1998)(quoting <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106, 110 (1st Cir.1987)).  "A plaintiff establishes a prima facie case by demonstrating that there are items which the debtor failed to disclose in his schedules or that the debtor falsely stated information in his schedules." <u>Eastern Diversified Distributors, Inc. v. Matus (In re Matus)</u>, 303 B.R. 660, 677 (Bankr. N.D. Ga. 2004).  "The burden then shifts to the debtor to overcome the inference with credible evidence and show that the misrepresentations and/or omissions were not made knowingly and fraudulently." <u>Id</u>.  "Once plaintiff has satisfied its burden of proving that debtor's sworn oath was false, the burden shifts to the debtor to justify its actions." <u>Hillis v. Martin (In re Martin)</u>, 124 B.R. 542, 545 (Bankr. N.D. Ind. 1991).  "Where it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an intentional misrepresentation." <u>MacLeod v. Arcuri (In re Arcuri)</u>, 116 B.R. 873, 884 (Bankr. S.D.N.Y.1990).  "'Otherwise, the court may infer fraudulent intent from the unexplained false statement.'" <u>Id</u>. (quoting B. Weintraub & A. Resnick, Bankruptcy Law Manual ¶ 3.03[4][a] at 3-10 (2d ed.1986)).  "'Absent a 'credible explanation,' <u>In re Cline</u>, 48 B.R. at 584, the court may infer fraudulent intent from an unexplained false statement." <u>Id</u>.  "[O]nce the Plaintiff/Trustee meets his initial burden of showing fraudulent intent on the part of the Debtor, it is incumbent upon the Debtor to proffer some evidence explaining the omissions from his schedule of personal property and his statement of financial affairs." <u>Groupe v. Braun (In re Braun)</u>, 98 B.R. 382, 386 (Bankr. N.D. Ill. 1989).  "[O]nce it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged.'" <u>Noble v. Renner (In re Renner)</u>, 45 B.R. 414, 416 (Bankr. D. Md. 1984)(quoting <u>In re Mascolo</u>, 505 F.2d 274, 276 (1st Cir. 1974)).  "'[T]he trier may infer fraudulent intent from an unexplained false statement.'" <u>Id</u>.  "[W]hile the initial burden lies on the objector to prove that the debtor made a false statement in connection with the proceedings, once it 'reasonably appears the oath is false, the burden falls on the bankrupt' to disprove the allegation." <u>Torgenrud v. Schmitz (In re Schmitz)</u>, 224 B.R. 149, 151 (Bankr. D. Mon. 1998)(quoting <u>Scimeca v. Umanoff</u>, 169 B.R. 536, 542 (D.N.J. 1993)(quoting <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106, 110 (1st Cir.1987)(quoting <u>In re Mascolo</u>, 505 F.2d 274, 276 (1st Cir. 1974)), <u>aff'd</u>, 30 F.3d 1488 (3rd Cir. 1994))).  "'[W]here it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an

68

The evidence presented at trial proves that Mr. Farris made misrepresentations under oath in his bankruptcy schedules and statement of affairs regarding matters that are material to the administration of his bankruptcy estate. Specifically, he falsely answered Question 18 of his <u>Statement of Financial Affairs</u>. In addition, he falsely answered either Question 11 of his <u>Statement of Financial Affairs</u> or Question No. 2 of his <u>Schedule B - Personal Property</u>. That proof makes out a prima facie case for denial of Mr. Farris' discharge pursuant to section 727(a)(4)(A). With that proof, the burden of proving that his misrepresentations were not made knowingly or fraudulently, or were the result of honest mistake, shifted to Mr. Farris. He did not meet his burden. As such, the Court may, and does, infer fraudulent intent.

Based on the above, the Court concludes that Mr. Farris made false statements in his bankruptcy schedules and statement of affairs for the purpose of deceiving and misleading his creditors and the bankruptcy trustee. Specifically, the Court finds: (1) the debtor made a false statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent

---

intentional misrepresentation.'" <u>Painewebber Inc. v. Gollomp (In re Gollomp)</u>, 198 B.R. 433, 437 (S.D.N.Y. 1996)(quoting <u>MacLeod v. Arcuri (In re Arcuri)</u>, 116 B.R. 873, 884 (Bankr. S.D.N.Y.1990)). "If the debtor fails to provide such evidence or a credible explanation for his failure to do so, a court may infer fraudulent intent." <u>Id</u>. "[T]he making of a false oath is sufficient to justify an inference of an intent to defraud creditors ...." <u>In re Steiker</u>, 380 F.2d 765, 767 (3rd Cir. 1967)(quoting <u>In re Kaufhold</u>, 256 F.2d 181, 185 (3rd Cir. 1958)). "[T]he making of a false oath is sufficient to justify an inference of an intent to defraud ...." <u>Keeble v. Sulmeyer</u>, 290 F.2d 127, 130 (9th Cir. 1961). "[T]he utterance of an intentional untruth in a matter material to the issue which is itself material is no more than a characterization of what is sufficient to justify an inference of an intent to defraud the bankrupt's creditors." <u>Tancer v. Wales (In re Wales)</u>, 156 F.2d 627, 628 (2nd Cir. 1946). Where the debtor "... presents no fact or circumstance which tends to excuse or explain the falsity or to reconcile his act in making the statement with an honest intent ... the inference drawn by the trier of the facts that it was fraudulently done can not be deemed unjustified." <u>Aronofsky v. Bostian</u>, 133 F.2d 290, 292 (8th Cir. 1943). <u>Accord, Boroff v. Tully (In re Tully)</u>, 818 F.2d 106, 110 (1st Cir.1987); <u>In re Mascolo</u>, 505 F.2d 274, 276 (1st Cir. 1974); <u>Scimeca v. Umanoff</u>, 169 B.R. 536, 542 (D.N.J. 1993), <u>aff'd</u>, 30 F.3d 1488 (3rd Cir. 1994); <u>Chase v. Harris (In re Harris)</u>, 385 B.R. 802, 805 (1st Cir. BAP. Mass. 2008); <u>Forrest v. Bressler (In re Bressler)</u>, 387 B.R. 446, 461 (Bankr. S.D.N.Y. 2008); <u>Pereira v. Gardner (In re Gardner)</u>, 384 B.R. 654, 662-663 (Bankr. S.D.N.Y. 2008); <u>Republic Credit Corp. I v. Boyer (In re Boyer)</u>, 367 B.R. 34, 45 (Bankr. D. Conn. 2007); <u>Daniel v. Boyd (In re Boyd)</u>, 347 B.R. 349, 354-355 (Bankr. W.D. Ark. 2006); <u>Baron v. Klutchko (In re Klutchko)</u>, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005); <u>Rothman v. Beeber (In re Beeber)</u>, 239 B.R. 13, 27 (Bankr. E.D.N.Y. 1999); <u>Montey Corp. v. Maletta (In re Maletta)</u>, 159 B.R. 108, 112 (Bankr. D. Conn. 1993); <u>Bank of India v. Sapru (In re Sapru)</u>, 127 B.R. 306, 315 (Bank. E.D.N.Y. 1991); <u>Kriseman v. Ingersoll (In re Ingersoll)</u>, 106 B.R. 287, 293 (Bankr. M.D. Fla. 1989), <u>aff'd</u>, 124 B.R. 116 (M.D. Fla. 1991); <u>Gordon v. Mukerjee (In re Mukerjee)</u>, 98 B.R. 627, 629 (Bankr. D.N.H. 1989); <u>McNulty v. Sullaway (In re Sullaway)</u>, 66 B.R. 320, 322 (Bankr. D. Mass. 1986); <u>Pigott v. Cline (In re Cline)</u>, 48 B.R. 581, 584 (Bankr. E.D. Tenn. 1985).

69

intent; and (5) the statement was material to the bankruptcy case. Consequently, Mr. Farris' discharge must be denied pursuant to section 727(a)(4)(A).

## B. Mr. Farris' Discharge Must be Denied Under Section 727(a)(7) (via § 727(a)(3)) for Concealment of, or Failure to Keep or Preserve, Records

Section 727(a)(3) of the Bankruptcy Code provides:

> The court shall grant the debtor a discharge, unless – (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case....

11 U.S.C. § 727(a)(3).

Section 727(a)(7) provides:

> The court shall grant the debtor a discharge, unless ... the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider...."

11 U.S.C. § 727(a)(7).

The above criteria are satisfied here. First, the Houston Steel, Inc. and Houston Steel Fabricators LLC bankruptcy cases were filed less than one year prior to the date Mr. Farris filed his personal petition.

Second, both Houston Steel, Inc. and Houston Steel Fabricators LLC are "insiders" as defined by section 101(31)(A) of the Bankruptcy Code. That section's definition of "insider" "includes – if the debtor is an individual – (i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control ..." 11 U.S.C. § 101(31)(A).

Houston Steel, Inc. is, by definition, an "insider" relative to Mr. Farris. Mr. Farris was the president of Houston Steel, Inc. when it filed bankruptcy.

Houston Steel Fabricators LLC is also an insider, but certain explanation is required. While section 101(31)(A) does not mention a limited liability company in its definition of an "insider" of an individual, the statutory list is not exclusive. The term "includes" must be construed as not limiting. 11 U.S.C. § 102(3). Hence, an insider of

70

an individual may include others not specifically listed in the statute who are sufficiently close to the individual where the two are not dealing at arm's length. Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.), 531 F.3d 1272, 1276 (10th Cir. 2008); In re Krehl, 86 F.3d 737, 741-742 (7th Cir. 1996); Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996) Carlson v. Farmers Home Administration (In re Newcomb), 744 F.2d 621, 625 (8th Cir. 1984); Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.), 712 F.2d 206, 210 n.4 (5th Cir. 1983).

Using the language of the Code section as exemplary of relationships which are characteristic of the requisite degree of closeness, it must be determined that a limited liability company is an "insider" of its managing member, or the person in control of it, and vice versa. Brooke Credit Corporation v. Lobell (In re Benoit), 390 B.R. 206, 218 (Bankr. M.D. La. 2008); In re Fortune Natural Resources Corp., 350 B.R. 693, 696 (Bankr. E.D. La. 2006); Solomon v. Barman (In re Barman), 237 B.R. 342, 348 (Bankr. E.D. Mich. 1999); O'Connell v. Shallo (In re Die Fliedermaus, LLC), 323 B.R. 101, 111 (Bankr. S.D.N.Y. 2005). The artificial, legal entity is an insider of the natural person who is either designated as the person officially in charge of managing that entity or is de facto in control of that entity. Hence, Houston Steel Fabricators is an "insider" of Mr. Farris.

Third, unlike one of the criteria necessary under section 727(a)(4)(A), "Under § 727(a)(3), a creditor need not prove a fraudulent intent...." Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 70 (1st Cir. 2004). It is clear that, "In order to deny discharge for failure to keep records the court need not find that the debtor intended to conceal his financial condition." Meridian Bank v. Alten, 958 F.2d 1226, 1234 (3rd Cir. 1992).[36]

Fourth, like section 727(a)(4)(A), if a creditor meets its initial burden, the burden shifts to the debtor. Writing for the Court in Meridian Bank v. Alten, 958 F.2d 1226, (3rd Cir. 1992), Circuit Judge Robert E. Cowen explains, "The Code now only requires that the creditor make an initial showing that the debtor's records are inadequate; thereafter the burden is on the debtor to prove justification." Id. at 1233.[37]

---

[36] See also, "[I]ntent to conceal one's financial conditions is not a necessary element for the denial of discharge under § 727(a)(3). Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1297 (9th Cir. 1994). "[C]reditors do not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation." In re Juzwiak, 89 F.3d 424, 43o (7th Cir. 1996).

[37] See also, "The initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained. If the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified." D.A.N. Joint Venture v. Cacioli (In re Cacioli), 463 F.3d 229, 235 (2nd Cir. 2006)."Once the objecting party shows that the debtor's records are absent or are inadequate, the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records." Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1296 (9th Cir. 1994). Accord, Robertson v. Dennis

Case 06-00101-BGC    Doc 45    Filed 09/30/08    Entered 09/30/08 11:26:41    Desc Main
Document    Page 71 of 75

As the evidence discussed above demonstrates, the documents Mr. Farris produced were woefully deficient of information from which his financial conditions or business transactions could be ascertained. Consequently, because the plaintiffs successfully proved that the records produced by Mr. Farris in the Houston Steel, Inc. and Houston Steel Fabricators LLC bankruptcy cases were inadequate, that is, they possessed insufficient information from which one might reasonably ascertain the respective financial condition and business transactions of those companies, the burden shifted to Mr. Farris to prove that his failure to maintain adequate records was justified under the circumstances. He did not. His conflicting explanations were not plausible. Each was contradicted by Mr. Edwards' testimony about the other.

Therefore, the plaintiffs successfully carried their burden of proving, by a preponderance of evidence, that within one year before the date Mr. Farris filed the pending case, in connection with the bankruptcy cases of Houston Steel, Inc. and Houston Steel Fabricators LLC, who are, in relation to him, both insiders, Mr. Farris concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the financial condition or business transactions of those two entities might be ascertained.

That proof makes out a prima facie case for denial of Mr. Farris' discharge pursuant to section 727(a)(7) by way of section 727(a)(3). Mr. Farris failed to produce any credible evidence justifying his concealment of or failure to collect, or failure to protect, the records of the companies he was overseeing. Therefore, he failed to rebut that prima facie case. Consequently, his discharge must be denied pursuant to section 727(a)(7) by way of section 727(a)(3)

## C. The Remaining Claims and Dischargeability of Debts Allegations are Moot

Because the Court finds that Mr. Farris' discharge must be denied in toto pursuant to sections 727(a)(4)(A) and 727(a)(7) via section 727(a)(3) of the Bankruptcy Code, the objections to discharge made by Airgas (and Oxygen) based on alternative grounds, as well as the nondischargeability determinations requested by Airgas (and Oxygen); Anderson & Associates, Inc.; General Steel, Inc.; Edward Damore; Kimberly A. Damore; Edward Damore as Trustee of the Damore 2002 Family Trust; Kimberly A. Damore as Trustee of the Damore 2002 Family Trust; and Two by Two, LLC, are moot.

The court in First Omni Bank v. Thrall (In re Thrall), 196 B.R. 959 (Bankr. D. Colo. 1996) explains, "a determination of dischargeability of a debt is meaningful only in the context of a discharge. If a case is dismissed prior to entry of discharge or the

_____

(In re Dennis), 330 F.3d 696, 703 (5th Cir. 2003).

72

discharge is denied or revoked, a judgment as to dischargeability of a debt becomes moot unless a subsequent bankruptcy is filed. Id. at 968 (emphasis added).[38]

### D. Postscript Regarding Judicial Notice

Rule 201(b) of the Federal Rules of Evidence authorizes a court to take judicial notice of a fact which is not subject to reasonable dispute in that it is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. In this Circuit, that rule is conditioned by the general rule, "a court in one case will not

---

[38]   See also: "Denial of discharge is logically the first issue to address, because if Debtor is denied a general discharge, the issue of dischargeability of a particular debt is moot in these proceedings." McLaughlin v. Jones (In re Jones), 114 B.R. 917, 921 (Bankr. N.D. Ohio 1990). "The threshold issue is whether the Debtor should be denied a general discharge in bankruptcy as a denial of his discharge will render the dischargeability issues academic and moot." Barnett Bank of Pasco County v. Decker (In re Decker), 105 B.R. 79, 82 (Bankr. M.D. Fla. 1989). "[T]he denial of a discharge renders moot the declaratory relief feature of the nondischargeability judgment." Watson v. City Nat'l Bank (In re Watson), 78 B.R. 267, 271 (Bankr. C.D. Cal. 1987).  "If a discharge is denied, a declaratory judgment of nondischargeability under section 523 is a waste of time, effort and expense for both the parties and the Court." Id.  "[I]f discharge is denied, all dischargeability proceedings become moot." Chillicothe State Bank v. Carroll (In re Carroll), 70 B.R. 143, 146 (Bankr. W.D. Mo. 1986)(quoting 1A Collier on Bankruptcy § 17.28A, p. 1742.3 (14th Ed. 1976)).

         Accord, Pilate v. Burrell (In re Burrell), 415 F.3d 994, 996-997 (9th Cir. 2005); Branch Banking & Trust Co. v. Chilton (In re Chilton), 2004 WL 3510108, *1 (M.D.N.C., April 15, 2004); State of Nebraska v. Strong (In re Strong), 293 B.R. 764, 769 (8th Cir. BAP 2003); Cepelak v. Sears (In re Sears), 246 B.R. 341, 352 (8th Cir. BAP 2000); Vaughn v. Aboukhater (In re Aboukhater), 165 B.R. 904, 912 (9th Cir. BAP 1994); Garland v. United States (In re Garland), 385 B.R. 280, 301 (Bankr. E.D. Okla. 2008); Kwi Angelvitch v. Chong Kil Yom (In re Chong Kil Yom), 2007 WL 2886357, *3 (Bankr. E.D. Va., Sept. 27, 2007); Ayers v. Babb (In re Babb), 358 B.R. 343, 360 n.5 (Bankr. E.D. Tenn. 2006); International Enterprises, Inc. v. Eddy (In re Eddy), 339 B.R. 8, 17 (Bankr. D. Mass. 2006); Morris v. Gaddy (In re Gaddy), 2004 WL 2044107, *4 (Bankr. D. Kan., April 12, 2004); Sterling Int'l, Inc. v. Thomas (In re Thomas), 2003 WL 21981707, *5, n.14 (Bankr. D. Idaho, July 17, 2003); Rasmussen v. Unruh (In re Unruh), 278 B.R. 796, 807 (Bankr. D. Minn. 2002); Levin v. DiLoreto (In re DiLoreto), 277 B.R. 607, 612 (Bankr. E.D. Pa. 2000); Allied Domecq Retailing USA v. Schultz (In re Schultz), 2000 WL 575505, *11 (Bankr. N.D. Ohio, April 21, 2000); Rothman v. Beeber (In re Beeber), 239 B.R. 13, 25 (Bankr. E.D.N.Y. 1999); Poos v. Dawdy (In re Dawdy), 1998 WL 34069398, *2 (Bankr. C.D. Ill., Oct. 15, 1998); Columbia Farms Distribution, Inc. v. Maltais (In re Maltais), 202 B.R. 807, 808 n.1 (Bankr. D. Mass. 1996); Kellogg-Citizens Nat'l Bank of Green Bay v. DeBruin (In re DeBruin), 144 B.R. 90, 94 n.2 (Bankr. E.D. Wis. 1992); Hubbell Steel Corp v. Cook (In re Cook), 126 B.R. 261, 270 (Bankr. E.D. Tex. 1991); The Everwed Co. v. Ayers (In re Ayers), 25 B.R. 762, 764 (Bankr. M.D. Tenn. 1982); Guardian Industrial Products, Inc. of Massachusetts v. Diodati (In re Diodati), 9 B.R. 804, 806 n.1 (Bankr. D. Mass. 1981).

73

take judicial notice of its own records in another and distinct case even between the same parties, unless the prior proceedings are introduced into evidence." <u>Concordia v. Bendekovic</u>, 693 F.2d 1073, 1076 (11th Cir. 1982). In addition, "courts may not take judicial notice of documents in separate judicial proceedings." <u>Brown v. Brock</u>, 169 Fed. Appx. 579, 582, 2006 WL 509563, *3 (11th Cir. 2006).[39]

Both of these qualifications are important in the current cases. In regard to the first, the Millenium Metal Works, Inc., Case No. 02-09584-TOM-7, was filed in this district, and in this division of that district. The documents in that case are available for viewing. The Court retrieved them from the Judiciary's archives where they have been stored since that case was closed. The docket sheet and claims docket, as well as docket sheets for related adversary proceedings, can be accessed online, at a minimal cost, by anyone who wishes to open a subscription through the Federal Courts PACER (Public Access to Court Electronic Records) system at http://pacer.psc.uscourts.gov/.

The issue arises here because none of the parties before this Court introduced the records from that case in the matters before this Court. Based on the general rule quoted above, that is, "a court in one case will not take judicial notice of its own records in another and distinct case even between the same parties, <u>unless the prior proceedings are introduced into evidence</u>," this Court did not take judicial notice of the records in Millenium Metal Works, Inc. 693 F.2d at 1076 (emphasis added).

Similarly, the records in the Houston Steel, Inc., Houston Steel Fabricators, and Damore-Abraham cases, filed in the Middle District of Georgia, Macon Division, can also be accessed and viewed through the PACER system. And because those cases were administered after that court's electronic case management system began, the actual documents filed in those cases can be viewed, printed, and downloaded. But, this Court did not take judicial notice of the records in those cases because of the general rule in this Circuit that, "courts may not take judicial notice of documents in separate judicial proceedings." 2006 WL 509563 at *3.

If this Court's interpretations of the above-cited qualifications is not correct, it would take whatever judicial notice of the records is permitted.

**VII. Conclusion**

Based on the above, the Court concludes, from a preponderance of evidence, that Mr. Farris' discharge must be denied.

---

[39] This unpublished decision is cited in accordance with Rules 36-2 and 36-3 of the court of Appeals for the Eleventh Circuit.

A separate order will be entered in conformance with the findings of fact and conclusions of law contained herein.

Done this the 30th day of September, 2008.


/s/Benjamin Cohen
BENJAMIN COHEN
United States Bankruptcy Judge

BC:sm

Case 06-00101-BGC    Doc 45    Filed 09/30/08    Entered 09/30/08 11:26:41    Desc Main
Document    Page 75 of 75